## MASTER AREA LICENSE AGREEMENT
### (Illinois and Wisconsin)

This Master Area License and Manufacturing Agreement ("Agreement") is made this 14th day of July, 2005 by and between Trakloc International, LLC, a Nevada limited liability company (hereinafter "Licensor"), whose California administrative office address is 1301 Dove Street, Suite 900, Newport Beach, CA 92660, and Pacific Rollforming, LLC, an Alaska limited liability company doing business as Trakloc Pacific (hereinafter, "Licensee"), whose business address is 3400 International Street, Fairbanks, Alaska 99701, with reference to the following facts:

WHEREAS Licensor has unencumbered rights to grant the licenses granted herein and to perform the obligations of Licensor set forth in the covenants of this agreement;

WHEREAS Licensee desires to obtain a license from Licensor to practice the inventions described in International Patent Application No. PCT/AU00/00500 and in a pending Australian Patent Application describing a method of making the structural members described in said Application No PCT/AU00/00500, as well as all patent applications filed and patents issued in the United States relating to the Patent Rights (hereinafter "said Inventions");

WHEREAS Licensee desires to obtain a license from Licensor to use the mark "TRAKLOC" in connection with Licensee's practice of said Inventions described in said International Patent Applications;

WHEREAS Licensee desires to obtain Technical Information from Licensor for use in practicing said Inventions described in said International Patent Applications;

WHEREAS Licensee has the requisite experience, resources and distribution channels to commercially practice said Inventions in the designated Territory; and

WHEREAS Licensor is willing to grant to Licensee said licenses and to provide said Technical Information in accordance with the terms and conditions set forth herein;

NOW THEREFORE in consideration of the foregoing premises and the following covenants, the parties hereto agree as follows:

**1. Definitions.** Solely for the purposes of this Agreement, the following terms shall have the following meaning:

1.1 "Products" shall mean structural members embodying and/or made by any of said Inventions described and claimed in the Patent Rights.

1

EXHIBIT __2__ PAGE __1__

1.2 "Technical Information" shall mean all associated documentation, designs, plans, specifications, drawings, instructions, and know-how for manufacturing the Products.

1.3. "Patent Rights" shall mean all rights under all United States Patent applications describing any of said Inventions described in said International and Australian patent applications and any United States Patent applications for any improvements to said Inventions filed or caused to be filed by any of Licensor, the applicant(s) and/or the inventor(s) named in said International and Australian Patent applications or by any entity affiliated or related in any way with Licensor, said applicant(s) and/or said inventor(s), and all rights under any and all patents issued from said United States applications and any and all reissues of said issued patents. "Patent Rights" includes, but is not limited to, those United States Patent Applications filed with the United States Patent and Trademark Office entitled "Structural Members and Joining Arrangements Therefor" and "Structural Members with Gripping Features and Joining Arrangements Therefo."

1.4 "Territory" shall mean solely the States of Illinois and Wisconsin.

1.5 "Licensee's Other Licensed Territories" shall mean the territories listed in Schedule A of that certain Master Area License Agreement between the parties hereto dated January 21, 2005.

## 2. Licenses.

2.1. Licensor hereby grants to Licensee and Licensee accepts an exclusive right and license under the Patent Rights to make, have made, use, sell and offer to sell Products in the Territory and to import Products into the Territory which are manufactured in Licensee's Other Licensed Territories. If Licensee wishes to import Products into the Territory which are manufactured outside the Territory and outside Licensee's Other Licensed Territories, Licensee may advise Licensor of the circumstances of such proposed importing of Products and request Licensor, in writing, to permit such importing of Products from outside the Territory and outside Licensee's Other Licensed Territories, and Licensor will permit such importing so long as (a) the area from which the Products are being imported is not then licensed to another area licensee, or (b) if the area from which the Products are being imported is then licensed to another area licensee, that other licensee consents, in writing, to Licensee's proposal after full disclosure of the circumstances of such proposal to such other area licensee.

2.2. Licensee shall have the right to grant sublicenses, provided that the sub-licensees agree to be bound by a written sublicensing or distributor agreement in a form satisfactory to Licensor in its reasonable discretion, which is consistent with the provisions of this Agreement and shall not be effective until approved by Licensor in its reasonable discretion.

2

EXHIBIT 2 PAGE 2

2.3. Licensor hereby grants to Licensee and Licensee accepts a sole right and license in the Territory and Licensee's Other Licensed Territories to use the mark "TRAKLOC" on Products that Licensee sells or offers to sell under the license granted in Section 2.1, to use the mark "TRAKLOC" for services that Licensee provides in connection with the sale of said Products under the license granted in Section 2.1, and to use the trade names "TRAKLOC PACIFIC" and "TRAKLOC MIDWEST" for its business of practicing said Inventions. The license granted under this Section 2.3. includes the right to grant a sublicense of the trade name "TRAKLOC MIDWEST" to a third party entity under a sublicense to that entity, effective upon approval of that sublicense by Licensor.

2.4. Licensee's use of the mark "TRAKLOC" shall always be accompanied by the appropriate trademark/service mark designation, such as TM, SM or ®.

2.5. Licensee agrees to comply with any and all instructions from Licensor regarding the use, placement and design of the mark "TRAKLOC".

2.6. Licensee agrees to reproduce the mark "TRAKLOC" on every ten (10) lineal feet of Product in a conspicuous location. Licensee shall comply with the reasonable instructions of Licensor regarding the size and location of the Licensor trademark on the manufactured goods.

2.7. Licensee agrees not to use the mark "TRAKLOC" on any goods or in connection with any services that are not in conformance with quality assurance standards specified by Licensor.

2.8. Licensee's use of the mark "TRAKLOC" in any form shall inure solely to the benefit of Licensor for appropriate registration of the mark "TRAKLOC" as a trademark and/or service mark with United States Patent and Trademark Office; and Licensee agrees to provide to Licensor specimens of such use as required to effect said registrations.

2.9. No use by Licensee of the mark "TRAKLOC" or the trade names "TRAKLOC PACIFIC" or "TRAKLOC MIDWEST" shall create any rights inuring to Licensee in or to the mark "TRAKLOC" or in or to any trade name including the word "TRAKLOC".

2.10. All goodwill derived from Licensee's use of the mark "TRAKLOC" either alone or in combination with other terms shall inure to the benefit of Licensor.

## 3. Terms of Licenses.

3.1. Unless earlier terminated pursuant to Part 19 or Part 20 of this Agreement, the license granted in Section 2.1. and any sublicenses granted pursuant to Section 2.2. shall terminate upon the expiration of the last-to-expire United States Patent included in the Patent Rights.

3

EXHIBIT 2 PAGE 3

3.2.  Unless terminated pursuant to Part 19 or Part 20 of this Agreement, the license granted in Section 2.3. shall not terminate until such time as Licensee has abandoned all use of both the mark "TRAKLOC" and the trade names "TRAKLOC PACIFIC" or "TRAKLOC MIDWEST" for at least one year.

## 4. Licensor's rights outside of Territory; Limitations on Licensor within Territory.

4.1.  The license granted herein under Section 2.1. places no restriction on Licensor's right to grant licenses under the Patent Rights outside the Territory to any third party.

4.2.  Licensor shall not directly or indirectly make, have made, use, market, sell, or distribute Products in the Territory or import Products into the Territory.

4.3.  Licensor shall not sell or distribute any Products to any third party who has made, used, sold or offered to sell any Products within the Territory or imported Products into the Territory, or who has indicated a desire to make, use or sell any Products within the Territory or to import Products into the Territory.

4.4.  Licensor shall not enable any third-party entity (including, but not limited to, licensee(s) under the Patent Rights for any other territory), whether or not affiliated or related in any way with Licensor, to make, have made, use, market, sell, or distribute Products in the Territory, to import Products into the Territory, or to sell or distribute Products to any other third party who has made, used, sold or offered to sell any Products within the Territory or imported Products into the Territory, or who has indicated a desire to make, use or sell any Products within the Territory or to import Products into the Territory.

4.5.  Any other rights not expressly granted in this Agreement are retained by Licensor.

## 5. Delivery of Technical Information

5.1.  Upon execution of this Agreement, Licensor shall deliver to Licensee in a timely manner all tangible forms of the Technical Information.

5.2.  Upon any and all development of additional Technical Information by any of Licensor, the applicant(s) and/or the inventor(s) named in said International Patent applications or by any entity affiliated or related in any way with Licensor, said applicant(s) and/or said inventor(s) or by licensee(s) under the Patent Rights for any other territory, Licensor shall deliver all tangible forms of said additional Technical Information to Licensee in a timely manner.

## 6. Territorial Limitations.

6.1.  Licensee will not grant a sublicense under this Agreement, pursuant to Section 2.2. hereof, to any third party outside the Territory or sell or distribute the

4

EXHIBIT 2 PAGE 4

Products in any state in which an exclusive license under the Patent Rights has been granted to a third party.

6.2. If Licensee has knowledge that one of its customers will or has marketed, sold or distributed Products to a third party in any state in which an exclusive license under the Patent Rights has been granted to a third party, Licensee will promptly provide written notice to Licensor of the identity of the customer and the location where the Products have been marketed, sold or distributed. Licensor may then, in its sole discretion, advise Licensee to instruct the customer of Licensee to cease the sale and distribution of the Products outside of the Territory. If the customer persists in the sale and distribution of the Products outside the Territory, Licensor shall have the right to instruct Licensee to cease all further sales to that customer and Licensee shall comply with any such instruction.

6.3 Notwithstanding the foregoing provisions of this Part 6, if a customer of Licensee wishes to purchase Products for a project located in a territory (other than in any of Licensee's Other Licensed Territories) which is subject to another party's Master Area License Agreement, then Licensee shall notify Licensor of such event and shall concurrently refer the customer to the licensee (the "Other Licensee") for the state in which the project is or will be located. Licensee and Other Licensee shall then negotiate in good faith a commission to be paid to Licensee for referral of the customer to Other Licensee, and the terms and conditions of such payment. If, after ten days from the date of such referral and notice to Licensor, Licensee and Other Licensee are unable to agree on the commission to be paid to Licensee or the terms and conditions of payment of same, then either Licensee or Other Licensee, by written notice to Licensor, may demand that Licensor resolve the matter and establish the commission and the terms and conditions of payment. In resolving such dispute, Licensor may require each party to submit its written proposal, may conduct joint or separate meetings or discussions with the parties, and may take any other action that Licensor deems necessary or appropriate to render a decision. Within ten days after the matter is submitted to Licensor for resolution, Licensor shall determine the matter, in its sole and absolute discretion, and the decision of Licensor shall be binding upon Licensee and Other Licensee for all purposes, without recourse or liability to Licensor.

## 7. Responsibilities of Licensor.

**7.1. Marketing Assistance.** During the term of this Agreement, Licensor may, from time to time, develop marketing programs for the Products. Licensor will advise Licensee of any national or regional marketing programs and allow Licensee to participate in such programs, if applicable. Licensee may consult with Licensor in the establishment by Licensee of its marketing programs.

**7.2. Marketing Literature.** If Licensor, during the term of this Agreement, develops marketing literature for the Products, Licensor will provide such marketing information, as well as any brochures, advertisements or related marketing literature developed by Licensor, to Licensee for use by Licensee in the marketing of the Products.

EXHIBIT 2 PAGE 5

Licensee may, at its own expense, reproduce and distribute such marketing literature. Licensee may also modify or enhance such materials at its own expense, so long as Licensee complies with the requirements of Section 8.3.

7.3 **Leads.** Licensor will promptly forward to Licensee any and all leads, inquiries or contacts, and all associated information, related to the sale of Products in the Territory.

7.4 **Modification or Enhancement of Manufacturing Process.** Licensor shall provide written notice to Licensee of any and all improvements in the technology, material enhancements, derivative works, additions or error corrections made to the Technical Information that is incorporated into the Products. Such notice shall describe in sufficient detail such improvement, enhancement, modification or error correction and Licensee shall have the right to incorporate such improvements, enhancement, modification or error correction into the Products.

7.5 **Manufacturing Equipment.** Licensor shall arrange for machines to manufacture the Products to be made available to Licensee for purchase or lease from vendors which shall be approved by Licensor. Only vendors approved by Licensor may be used and only machines arranged by Licensor may be used to manufacture the Products.

7.6. **Status of Patent Applications.** Licensor shall arrange for its patent counsel to promptly provide to Licensee's patent counsel, for his eyes only and without disclosure to Licensee or any other person, from time to time, no more frequently than two times in any 12-month period, upon reasonable request to Licensor, copies of such applications, amendments, correspondence and other information relating to the Patent Rights, as Licensor and its patent counsel, in their reasonable discretion, deem appropriate for disclosure to Licensee's patent counsel.

## 8. Responsibilities of Licensee.

8.1 **Use of Best Efforts.** Licensee will use its best efforts to market, sell and distribute the Products in the Territory and to increase annually the sales volume of the Products in the Territory. Licensee shall use all methods normally and effectively utilized by licensees or distributors of galvanized steel studs and tracks in the Territory. Licensee shall bear all costs and expenses incurred in the marketing, selling and distribution of the Products in the Territory and in the performance of its obligations under this Agreement.

8.2 **Quarterly Reports.** Licensee shall furnish to Licensor on a quarterly basis a written report of potential sales and general marketing conditions in the Territory. The reports supplied by Licensee to Licensor will contain the latest information available in regard to marketing forecasts in the Territory. Such reports shall be in form reasonably acceptable to Licensor.

6

EXHIBIT 2 PAGE 6

8.3  Approval of Marketing Literature.  Licensee will submit to Licensor for review and approval prior to its dissemination all marketing literature that Licensee creates that is a deviation, modification or enhancement, regardless of materiality, of the standard marketing material delivered to Licensee under Section 7.2.  If Licensor does not respond within thirty (30) days after a submission by Licensee, the submitted literature will be deemed approved.

8.4. Product Improvements By Licensee.  Licensee shall promptly disclose in writing to Licensor any improvement to said Inventions made by Licensee.  Licensee shall make such disclosure prior to utilizing such improvement and prior to publicly disclosing such improvement.  Licensor shall have the right, in its sole discretion, (a) to either approve or disapprove modification of the Products and/or modification of the manufacture of the Products in accordance with any such improvement, (b) to incorporate any such improvement into the Technical Information that is proprietary to Licensor and confidential, (c) to publicly disclose such improvement, and (d) to decide whether or not a patent application should be filed for such improvement and whether or not said patent application should be assigned to Licensor.  Licensee agrees to cooperate with Licensor in said filing and assignment of any such patent application, provided that Licensor pays all costs and fees incident to said filing and assignment of said patent application.

8.5  Supervision of Sub-licensee.  Licensee shall be responsible for ensuring that each sub-licensee of Licensee complies with the requirements and conditions contained in the form of sub-licensing agreement for such sub-licensee approved by Licensor. Licensee shall conduct periodic inspections of such sub-licensee's manufacturing facility and, if necessary or appropriate, shall audit such sub-licensee's books and records.

8.6  Manufacturing.  Licensee shall purchase or lease the equipment necessary to manufacture the Products only from vendors approved by Licensor.  Licensee shall order and place in service the number of machines specified in Section 12 hereof, within the time periods described in Section 12 hereof, and shall manufacture the Products in the Territory pursuant to the terms and conditions of Section 12 hereof.

## 9. Royalties.

9.1  Royalties.  As consideration for the grant of the License, Licensee shall pay royalties to Licensor as set forth in Schedule A.  Licensee also agrees to pay minimum annual royalties (the "Minimum Annual Royalties"), as set forth in Schedule B.

9.2 Reporting and Royalty Payment Requirements.  Licensee shall fax and mail to Licensor a monthly report disclosing (a) the total number of lineal feet of all Products shipped to customers in the Territory, for which payment was received in the prior month on all prior sales in the Territory, (b) the total number of lineal feet of all Products produced at each manufacturing facility in the Territory, if any, (c) the total number of lineal feet of Product shipped from the Territory to each of Licensee's Other Licensed Territories or to any other location outside the Territory, if any, broken down for each state, and (d) the amount of Schedule A Royalties due for the Territory for the

7

EXHIBIT 1 PAGE 7

prior month. Each monthly report shall be due on or before the last day of the following month. Concurrent with the filing of the monthly report, Licensee shall wire to Licensor any royalty payment due as shown in such report. Such report shall include all sales by or to sub-licensees for the applicable reporting period.

9.3 **Late Charges.** If Licensor does not receive the full amount due on or before the date upon which such amounts are due and payable, or the next banking day if such due date is not a banking day, and Licensee fails to cure such default within ten (10) days after such payment is due, then a late payment fee equal to 10% of the amount then due shall be charged and shall be due with such late payment.

9.4 **Place of Payment.** Until instructed otherwise by Licensor in writing, all royalty payments shall be made by wire to Licensor, pursuant to the wiring instructions attached hereto as Schedule C, and the monthly reports shall be faxed, mailed or delivered to Licensor c/o Richard E. Knecht, 1301 Dove Street, Suite 900, Newport Beach, CA 92660 (fax number: 949-851-1732).

9.5 **Taxes.** In addition to all the amounts due to Licensor under this Agreement, Licensee shall be responsible for any sales, use, excise, property or other federal, state, local or foreign taxes, duties or tariffs related to the exercise by Licensee of its rights under this Agreement.

10. **Licensee Records.** Licensee shall keep at its principal place of business accurate records, during the term of this Agreement and for two (2) years thereafter, relating to the manufacture, marketing, sale, distribution, use and sub-licensing by Licensee of the Products. Such business records shall include manufacturing logs or records, the identity, address, date of delivery, and type and total of Products sold to a customer and a copy of the original invoice to each customer.

11. **Right of Audit.** Licensor, or its authorized representatives, shall have the right upon reasonable notice (not less than five business days) and during Licensee's normal business hours to enter Licensee's premises once during any twelve (12) month period for the purposes of auditing any and all records, documents, journals and files relating to the Products and the manufacture, distribution or sale of the Products. Licensee's records shall be considered confidential and shall not be disclosed by Licensor or its authorized representatives except to the extent reasonably necessary to determine the accuracy of the Royalty reports. Licensee shall promptly pay any amounts due and owing to Licensor as a result of the audit upon written demand. Licensor shall bear the cost of the audit unless the audit discloses a discrepancy in the payment of Royalties of more than five percent (5%), in which event Licensee shall reimburse Licensor for the cost of the audit within thirty (30) days of receiving a written demand for said reimbursement.

12. **Manufacturing.**

12.1 **Quality Assurance.** Licensee shall adhere to the instructions, specifications and designs contained in the Technical Information in the manufacture of the Products,

EXHIBIT 2 PAGE 8

and will make all remedial changes recommended by Licensor to maintain Licensor's standard of quality. Licensee shall make no modification in the manufacture of the Products without the prior written consent of Licensor. The Products manufactured by Licensee shall be of a fit, merchantable, and workmanlike quality and free from defect.

**12.2 Materials.** Licensee will ensure that the materials used in the manufacture of the Products comply with AISI standards for light gauge steel.

**12.3 Right to Inspect.** Licensor, or its representatives, shall have the right, during normal business hours and not more than twice a year, to visit and inspect the manufacturing facility and equipment used in the manufacturing of the Products and the inventory of the Products to ensure that Licensee is in compliance with the AISI standards and the specifications and requirements contained in the Technical Information.

**12.4 Samples.** Licensee will deliver, at its expense, to Licensor a set of samples of the Products once the manufacturing process is established, but prior to the sale and distribution of the Products. Licensor shall promptly notify Licensee in writing of any defects or variances in the samples. Licensee will correct all defects and variances from the Technical Information provided by Licensor. Once production of the Products has begun, Licensee will submit to Licensor, at its expense, one set of samples of the Products for every 500 tons of rolled steel used in the manufacture of the Products.

**12.5 Equipment Order Date and Placement in Service Date.** On or before October 15, 2005, Licensee shall place orders for 4 new stud and/or track manufacturing machines to produce Products for sale, with such equipment, when installed, to be located anywhere inside the Territory or any of Licensee's Other Licensed Territories. This order must be made with the exclusive equipment supplier for Licensor. This supplier is Samco Machinery Company located in Toronto, Ontario, Canada. Subject to timely performance by SAMCO Machinery Company, Licensee shall place all 4 new machines in service on or before July 15, 2006.

## 13. Dies and Tooling.

**13.1 Purchase.** Licensee shall purchase the dies and tooling, at its expense, only from approved vendors and such dies and tooling will comply with the specifications and designs outlined in the Technical Information. Licensor will assist Licensee in arranging for the purchase of conforming dies and tooling.

**13.2 Modification.** Licensee shall make no alteration, modification or adjustment to the dies or tooling without the prior written consent of Licensor. Licensee shall not sell or transfer the dies or tooling without the prior written permission of Licensor. Further, Licensee shall not remove, alter, modify or conceal any markings, designations or numbers contained on the dies or tooling.

## 14. Restrictions on Authority.

9

EXHIBIT 2 PAGE 9

14.1   **No Authority.**   Licensee shall have no authority to bind or commit Licensor to any contract or agreement or otherwise hold itself out as an agent of Licensor. Licensee shall have no authority, under any circumstances, either expressly or by implication, to incur any liability or obligation on behalf of Licensor. Except as granted under the license set forth in Section 3.3, Licensee shall have no authority to carry any accounts in the name of Licensor. Licensee is solely responsible for its own salespeople and representatives and for their actions. This Agreement does not give rise to or constitute a partnership or joint venture.

14.2   **Independent.**   Licensee acknowledges that it is an independent contractor. Licensee, in its sole and exclusive discretion, will establish its own resale prices for the Products. Licensor shall exercise no control over, nor have a right to control the activities or operations of Licensee, except as provided within this Agreement. Licensee shall conduct its business in a manner that reflects favorably on Licensor and shall use its reasonable efforts to promote the goodwill and image of Licensor in the Territory.

## 15. Proprietary Rights In Technical Information.

15.1   **Nature of Proprietary Rights.**   The Technical Information contains valuable confidential information and trade secrets developed through the substantial expenditure of time and resources and acquired by Licensor due to the expenditure of money. Licensee acknowledges and agrees that any portion of the Technical Information that was not previously known to Licensee or to the general public is and shall remain proprietary to Licensor until such time as such respective previously unknown portion becomes known to the general public through no fault of Licensee.

15.2   **Obligations Regarding Confidential Information.**   Licensee agrees to observe complete confidentiality with regard to those portions of the confidential proprietary Technical Information that Licensor has marked as "confidential", including, but not limited to, not disclosing or otherwise permitting any third person or entity access to the confidential-marked proprietary Technical Information (access shall be permitted to an employee or consultant of Licensee only on a need-to-know basis) and making sure employees or consultants who receive access to the confidential-marked proprietary Technical Information are advised of its confidential and proprietary nature. Further, Licensee will obtain in writing from such employees and consultants an obligation to not copy, disclose or use the confidential-marked proprietary Technical Information in an unauthorized manner. In addition the Licensee shall use the confidential-marked proprietary Technical Information only in the exercise of the license granted in Section 2.1.

15.3   **Survival of Obligations and Equitable Relief.**   Licensee's obligations and Licensor's rights under this Section 15 shall survive the expiration or termination of the licenses granted under this Agreement regardless of reason or cause. The confidential proprietary Technical Information is unique property of extreme value and any breach of the confidentiality obligations under this Agreement would cause Licensor and its licensor irreparable harm that cannot be adequately assessed in monetary damages.

EXHIBIT _2_ PAGE _10_

Therefore, Licensee agrees that Licensor is entitled to such equitable relief to remedy any actual or threatened breach of the proprietary rights provisions contained herein.

16.   Warranty and Indemnification by Licensor; Action to Abate Infringement; Patent Approval.

16.1   Right to Grant Exclusive License and Provide the Technical Information. Licensor represents and warrants that it has the right to grant the exclusive License in the Territory and provide the Technical Information to Licensee as provided in this Agreement.   Licensor further represents and warrants that any termination or modification of Licensor's rights with respect to the Products shall in no way alter or modify licensee's rights with respect to the Products under this Agreement.

16.2 Indemnification by Licensor.

(a)   Licensor shall indemnify and hold harmless Licensee and its employees, from and against any and all claims, losses, damages, costs and expenses (including attorneys' fees and amounts paid in settlement in good faith) which may be suffered or incurred by any of them as a result of any claims arising out of, or relating to, the use of the mark and trade name TRAKLOC or as a result of Licensee's practicing the Patent Rights licensed hereunder.

(b)   Licensor agrees upon receipt of written notification from Licensee to assume full responsibility for the defense of any legal action or proceeding that may be brought against Licensee or its directors, officers, members, managers, or agents for any actual or alleged infringement of a U.S. patent as a result of any use of the Products or the sale of the Products within the Territory. Licensor further agrees to indemnify and hold harmless Licensee and its directors, officers, members, managers, and agents against any and all reasonable expenses, claims, losses, profits and damages, including without limitation court costs, reasonable attorneys' fees and disbursements and amounts paid in settlement (that Licensor consents to) or final judgment resulting from any such suit or proceeding; provided, however, that Licensor's obligation to pay damages and costs on behalf of Licensee pursuant to this Section 16.2 shall not in any event exceed the total of all amounts actually paid by Licensee to Licensor under this Agreement and/or any prior agreement between the parties. While Licensee may, at its own expense, be represented by and actively participate through counsel of its choosing in any such suit, investigation or proceeding if Licensee so desires, Licensor will have full authority to control the defense and settlement of any such action. Licensee agrees to deliver prompt notice of any such legal action or proceeding to Licensor; provided, however, that Licensor's obligations hereunder shall not be relieved due to the failure to deliver prompt notice unless Licensor's ability to defend any such legal action or proceeding is prejudiced by such failure. This obligation to indemnify shall become void if the infringement arises from or is related to any unauthorized use of the Products or a breach of this Agreement by Licensee.

EXHIBIT 2 PAGE 11

16.3  Prosecution by Licensor of Legal Action for Patent Infringement. Upon receipt of written notification from Licensee of any manufacture, use or sale of the Products in the Territory or importation of the Products into the Territory by any person or entity other than Licensee, Licensor shall have the right, but not the obligation, to prosecute and take the steps necessary to abate the infringement and control such litigation. Both parties agree that they will fully cooperate with each other in the prosecution of any such action. In the event that Licensor declines to prosecute such action within ninety (90) days after written notification, then Licensee may prosecute and take the steps necessary to abate the infringement, including the filing of any necessary action in the name of Licensor, and to control such action. In the event that Licensee elects to prosecute such action, Licensee shall have the right to apply up to fifty percent (50%) of all royalties becoming due during such action to the cost of such legal action.

16.4. Patent Approval. On or before January 21, 2007, Licensor shall obtain one or more U.S. patents covering the Products.

17. Insurance.  Licensee shall obtain at its cost, with an insurer at least rated "A" according to Best and who is authorized to do business in the Territory, and to keep in full force and effect during the term of the Agreement, insurance coverage naming Licensor, its officers, directors and equity holders as additional insureds as follows:

a.  A commercial general liability policy with limits of One Million Dollars ($1,000,000) per occurrence combined single limit for bodily injury and property damage with Two Million Dollars ($2,000,000) aggregate;

b.  A products liability insurance policy within the Territory in an amount of not less than One Million Dollars ($1,000,000).

Licensee shall immediately notify Licensor in writing of any accidents, injuries or claims that may give rise to a liability claim against Licensor or could materially affect Licensee's business.

18. Force Majeure. Except as otherwise set forth herein, if the performance of any part of this Agreement by either party is prevented, hindered, delayed or otherwise made impracticable by reason of flood, riot, fire, act of war or terrorism, labor disputes, act of God or any other causes beyond the control of either party, that party shall be excused from such performance to the extent that it is prevented, hindered or delayed by such causes.

19. Termination of Licenses At Sole Discretion of Licensee.

19.1. Licensee shall have the right, in its sole discretion, to terminate the license granted under Section 2.1 together with the royalty payment obligations set forth in Section 9, with said termination becoming effective at any time on or after the fifth anniversary of this Agreement by giving six months written notice of termination to Licensor at least six months prior to the effective date of any such termination. For

12

EXHIBIT 2   Page 12

example, Licensee can terminate the License granted under Section 2.1. together with said royalty payment obligations, with said termination becoming effective on the fifth anniversary of this Agreement by giving written notice of termination to Licensor at least six months prior to fifth anniversary of this Agreement.

19.2. Should Licensee terminate the license granted under Section 2.1. by giving notice of termination to Licensor in accordance with Section 19.1, the license granted under Section 2.3. will terminate on the effective date of termination of the license granted under Section 2.1.

19.3. Should Licensee possess an inventory of Products as of the effective date of termination in accordance with Section 19.1., Licensee shall have the right to sell said inventory of Products within six months following the effective date of termination, provided that Licensee reports said sales and makes royalty payments for said sales in accordance with Section 9.2.

**20. Remedies for Default.**

**20.1  Licensee's and Licensor's Remedies for Non-Monetary Default.**  For the purposes of this Agreement, default by either party shall be deemed to arise upon the failure to cure a non-monetary breach of any term or obligation of this Agreement for thirty (30) days following written notice from the other party outlining such breach. Upon the occurrence of such default by Licensor, Licensee shall not to be obligated for the payment of royalties for the sales of Products that occur during the period of time in which such default continues.   Upon the occurrence of such default by Licensee, following the notice and the 30-day cure period provided herein, Licensor shall be entitled to terminate this Agreement and the licenses granted hereunder by giving written notice of such termination to Licensee.

**20.2   Licensor's Remedies for Monetary Default for Licensee's Failure to Pay Minimum Annual Royalties.**  The failure of Licensee to pay Minimum Annual Royalties to Licensor in any calendar year shall be deemed a default.  Upon the occurrence of such default, Licensor shall be entitled to inspect Licensee's business and operations, retain an expert consultant to assist in evaluating Licensee's operations, and make recommendations to Licensee to assist Licensee in meeting Licensee's Minimum Royalty obligations. Licensee shall implement said recommendations unless Licensee can demonstrate that it lacks the financial means to do so. If Licensee fails to generate sales sufficient to pay Minimum Royalties in the following calendar year, including any deficiency for the prior year, Licensor shall have the right to make the License granted hereunder non-exclusive during the next following calendar year (the "Non-Exclusive Year"), unless Licensee elects to pay the cumulative difference to Licensor within thirty days of receipt of a default notice.  If Licensor elects to exercise the right to make the License non-exclusive, and Licensee elects not to pay said difference as provided above, and then Licensee fails to generate sales in the Territory to pay Minimum Royalties in the Non-Exclusive Year, and for the prior year or years in default,  Licensor shall be entitled, in its sole discretion, to terminate the License for the Territory, effective as of the last day

13

EXHIBIT 2 PAGE 13

of the Non-Exclusive Year, unless Licensee elects to pay said difference as provided above, within 30 days after receipt of the default notice.

**20.3  Licensor's Remedies for Monetary Defaults by Licensee.**  If Licensee fails to timely pay the Schedule A Royalties, or defaults in the performance of any other monetary requirement (other than a monetary default for failure to pay Minimum Annual Royalties, which shall be governed by Section 20.2 hereof), Licensor shall notify Licensee of such default and Licensee shall have 30 days from its receipt or deemed receipt of such notice, as provided in Section 25.6 hereof, to cure such default by wiring any funds due to Licensor on or before the last day of such 30-day period or the next banking day if such last day is not a banking day.  If Licensee fails to cure such monetary default as provided herein, Licensor may, in its discretion, terminate this Agreement and the licenses granted hereunder by giving written notice of such termination to Licensee.

**20.4  Failure to Obtain Patent.**  If Licensor fails to obtain one or more U.S. patents covering the Products in accordance with Section 16.4, then Licensee shall not to be obligated for the payment of royalties for the sales of Products that occur during the period beginning upon such failure and continuing until such time as such failure has been remedied.

**20.5  Other Remedies.**  Nothing in this Agreement shall prevent either party to this Agreement from asserting such other remedies against the other party to which such party may be entitled at law or in equity.

## 21.  Obligations, Rights and Duties on Termination.

**21.1  Termination of Licensee's Rights.**  Upon termination of this Agreement and the Licenses granted hereunder, Licensee's right to manufacture and sell the Products, shall terminate.  Further, all royalties then due and owing shall be promptly paid to Licensor.

**21.2  Rights of Sub-Licensee.**  Upon the termination of this Agreement, all of Licensee's rights and interests in the sub-license agreements between Licensee and a sub-licensee shall automatically be assigned to Licensor.  Licensor will assume the rights and duties of Licensee in each such sub-license agreement and thereafter neither Licensor nor the sub-licensee shall have any further obligations or duties to Licensee.

**21.3  Prohibition of Use.**   Licensee agrees that for a period of three (3) years following the termination of this Agreement, regardless of reason or cause, that it shall not manufacture, market, sell, distribute or sub-license a product or Products that is substantially similar in functionality to the Products.

**22.  Indemnity.**  Licensee shall indemnify and hold Licensor harmless for any and all claims, losses, liability, damages or expenses, including reasonable attorney's fees and costs, arising out of or incurred in connection with Licensee's manufacturing, marketing, sale, distribution or sublicensing of the Products or the use of the Technical Information,

14

EXHIBIT 2 PAGE 14

including all claims, losses, liability, damages or expenses, including reasonable attorney's fees and costs, arising out of or incurred in connection with a sub-licensee's manufacturing, marketing, sell or distribution of the Products or the use of the Technical Information.

23. **Assignment.** Licensee shall not assign or transfer this Agreement or any interest herein without the prior written approval of Licensor, which shall not be unreasonably withheld. Upon any approved assignment or transfer, this Agreement and all obligations herein, shall inure to the benefit of the successors and assigns.

24. **Acknowledgement.** Licensee acknowledges that its members have knowledge and expertise in the steel framing business and that it has fully reviewed the market and the Products. Licensee further acknowledges that Licensor has not guaranteed or warranted that the licensing of the Products would produce any specific sales results.

25. **Miscellaneous Provisions.**

25.1 **Entire Agreement and Severability Provisions.** This Agreement constitutes the entire understanding and agreement between Licensor and Licensee concerning the Territory and supersedes any and all prior, contemporaneous oral or written communications relating to the subject matter hereof, all of which are merged herein. This Agreement can only be modified, amended or altered by an instrument in writing, mutually signed by the parties hereto. Such amendment shall be binding with or without any additional consideration. If any provision of this Agreement is held unenforceable, said holding shall not be deemed to impair the validity of the remaining provisions of the Agreement, which shall remain in full force and effect.

25.2 **Waiver.** No waiver of any provision of this Agreement or any rights or obligations of either party hereunder shall be effective, except pursuant to written instrument signed by the party or parties waiving compliance. This waiver shall be effective only in the specific instance and the specific purpose stated.

25.3 **Relationship of Parties.** The relationship between Licensor and Licensee is that of licensor and licensee. Nothing contained herein shall be deemed or construed as creating a joint venture or partnership between Licensor and Licensee. Further, it is not the intention of this Agreement or the parties hereto to confer a third party beneficiary right of action upon any person or entity whatsoever.

25.4 **Governing Law and Choice of Forum.** This Agreement shall be construed and enforced in accordance with the laws of the State of California applicable to contracts wholly executed and wholly performed therein. The parties agree that, and hereby submit themselves to, the exclusive jurisdiction and venue for the purposes of resolving any action or proceeding brought by either party against the other arising out of or related to this Agreement shall be brought only in a state or federal court of competent jurisdiction located in Orange County, California.

25.5 **Attorney's Fees.** The prevailing party in any action or proceeding between Licensee and Licensor arising out of or related to this Agreement shall be entitled to recover its reasonable attorney's fees and costs incurred in connection therewith.

25.6 **Notices.** All notices required to be given under this Agreement shall be given in writing, may be sent by facsimile or email, and shall be deemed delivered and effective when actually delivered and such delivery is acknowledged by the recipient's return fax or email or other written correspondence, at the address shown below:

|  |  |
|---|---|
| If to Licensor: | Trakloc International, LLC<br>ATTN: Albert S. Hill<br>42130 Remington Drive, Unit 9B<br>Temecula, CA 92590<br>Fax: 951-296-5728<br>email: bud@trakloc.com |
| With a copy to: | Trakloc International, LLC<br>ATTN: Richard E. Knecht, Esq.<br>1301 Dove Street, Suite 900<br>Newport Beach, CA 92660<br>Fax: 949-851-1732<br>email: rknecht@knechtlaw.com |
| If to Licensee: | Pacific Rollforming, LLC<br>ATTN: Todd Beasley<br>3400 International Street<br>Fairbanks, AK 99701<br>Fax: 907-456-4079<br>email: beasleytodd@earthlink.net |
| With a copy to: | Frederick C. Phillips, Esq.<br>Phillips, Haskett & Ingwalson, a P. C.<br>701 "B" Street, Suite. 1190<br>San Diego, CA 92101<br>Fax: 619-233-1223<br>email: fcp@philaw.com |

Any party may change its address for notices under this Agreement by giving formal written notice to the other party, specifying that the purpose of the notice is to change the party's address with reference to this section of the Agreement.

25.7 **Authority.** Licensor and Licensee acknowledge that the persons executing this Agreement have the requisite authority to sign this document on behalf of Licensor or Licensee as indicated below.

16



25.8. Schedules as Part of Agreement.  Schedules A, B and C are expressly parts of this Agreement.

25.9. Headings Not Part of Agreement.  The headings of the Parts and Sections of this Agreement are for convenience only and are not part of this Agreement.

25.10 Ambiguities. Licensor and Licensee, both having had an opportunity to seek legal counsel and to review and revise this Agreement under the direction of same, are not subject to the normal rule of construction that ambiguities are to be resolved against the drafting party. This rule of construction shall not be employed in the interpretation of this Agreement or any amendment thereto.

25.12  Counterparts and Facsimile Signatures.  This Agreement may be executed in one or more duplicate counterparts and when signed by all of the parties listed below, shall constitute a single binding agreement.  Delivery of an executed signature page of this Agreement by facsimile transmission shall be as effective as delivery of a manually executed counterpart thereof.

　　　　IN WITNESS WHEREOF, this Agreement was executed as of the date first written above, to be effective upon Licensor's receipt of the $500,000 wire due on July 15, 2005, as described in Section II of Schedule A attached hereto.

Licensor:
Trakloc International, LLC,
a Nevada limited liability company


By: _____
　　Albert S. Hill
　　President

Licensee:
Pacific Rollforming, LLC,
an Alaska limited liability company


By: _____
　　Todd Beasley
　　Member

EXHIBIT 2 PAGE 17

SCHEDULE A
ROYALTY SCHEDULE

## I.   BASE ROYALTY

Licensee shall pay a royalty of $0.04 per lineal foot of Product sold for which payment is received until an aggregate of Seventy-Nine Million, Two Hundred Forty-Seven Thousand, Five Hundred (79,247,500) lineal feet of Product have been sold in the Territory and paid for, after which the royalty payment shall be reduced to $0.02 per lineal foot of Product sold in the Territory and for which payment has been received. This base royalty shall be effective immediately upon execution of this Agreement. All such payments shall be made by wire, as provided in Section 9.4 of the Agreement.

## II.   ADVANCE ROYALTIES

Licensee has previously paid an advance royalty payment of $200,000. On July 15, 2005, Licensee shall pay an additional advance royalty payment of $500,000. On or before August 2, 2005, Licensee shall pay an additional advance royalty payment of $100,000. Six additional advance royalty payments, of $130,825 each, shall be paid on or before October 15, 2005, January 15, 2006, April 15, 2006, July 15, 2006, October 15, 2006, and January 15, 2007. All such payments shall be made by wire, as provided in Section 9.4 of the Agreement.

Licensee shall receive credit (without interest), against the royalties due in Paragraph I above, on all advance royalty payments which shall be applied in a manner so as to reduce the number of lineal feet sold and paid for on which the initial royalty rate of $0.04 per lineal foot is required to be paid commensurate with the amount of advance royalties paid. For example, if total royalties of $500,000 are paid, the amount of lineal feet of product sold and paid for on which the initial royalty rate of $0.04 per lineal foot is based would be reduced by twenty five million (25,000,000) lineal feet.

Should any advance royalty payment not be paid on or before its due date, and should Licensee fail to cure such default within 10 days after such due date, a late payment fee of 10% of the amount owing shall be charged and shall be due with such late payment.

Should any advance royalty payment not be paid on or before its due date, and should Licensee fail to cure such default within 10 days after such due date, Licensor may, in its discretion, elect to accelerate the required payment of all unpaid advance royalty payments, and declare all such payments immediately due, by giving written notice thereof to Licensee.

18

EXHIBIT 2 PAGE 18

19

EXHIBIT 2 PAGE 19

SCHEDULE B
MINIMUM ANNUAL ROYALTY SCHEDULE

The Minimum Annual Royalty for the Territory shall be $633,980.

There will be no Minimum Annual Royalty for the 12-month period ending July 13, 2006. The Minimum Annual Royalty shall apply to the second year of this Agreement (July 14, 2006 through July 13, 2007) and to every year thereafter.

Once the Minimum Annual Royalty is applicable, and continuing for as long as the royalties described in Section I of Schedule A are paid at the rate of $.04 per lineal foot, $.02 of that amount shall be credited as payment against the Minimum Annual Royalty Amount.

20

EXHIBIT 2 PAGE 20

SCHEDULE C

# COMMERCE NATIONAL BANK

## INCOMING WIRE INSTRUCTIONS
### *(DOMESTIC WIRES)*

Commerce National Bank
279 E. Orangethorpe Ave
Fullerton, CA 92832

Phone:    714-451-8650
Fax:      714-578-6717

Routing Number:     1222-43703

**For Credit To:**

Customer Name:    Trakloc International, LLC

Customer Address:    1301 Dove Street, Suite 900

    Newport Beach, CA 92660

    ATTN:  Richard E. Knecht

Customer Account Number    0102001948

Special Instructions:

21

EXHIBIT 2 PAGE 21