1  FREDERICK C. PHILLIPS, #51337
   PHILLIPS, HASKETT & INGWALSON
2  a Professional Corporation
   701 "B" Street, Suite 1190
3  San Diego, CA 92101
   Telephone: (619) 231-3737
4  Facsimile: (619) 233-1223

5  Attorneys for:   Plaintiffs

6

7

8                    **UNITED STATES DISTRICT COURT**

9                   **SOUTHERN DISTRICT OF CALIFORNIA**

10  PACIFIC ROLLFORMING, LLC., dba )  CASE NO.   07CV1897  L   JMA
    TRAKLOC PACIFIC; TODD BEASLEY; )
11  CURT KINNEY; and ARCHITECTURAL )
    METAL PRODUCTS, INC.                  )
12                                        )  FOURTH   AMENDED   COMPLAINT   FOR
                                          )  BREACH OF CONTRACT, FRAUD, BREACH
            Plaintiffs,                    )  OF IMPLIED COVENANT OF GOOD FAITH
13                                        )  AND   FAIR   DEALING,   DEFAMATION,
    vs.                                    )  INTERFERENCE   WITH   PROSPECTIVE
14                                        )  BUSINESS   ADVANTAGE,   RICO,
    TRAKLOC NORTH AMERICA, LLC.,   )  CONVERSION AND DECLARATORY RELIEF
15  DAVID   JABLOW,   SOUTHEASTERN )
    METALS, INC., THOMAS HORST, TIN )       (JURY TRIAL DEMANDED)
16  PLATE PURCHASING CORPORATION, )
    MARC BERNSTEIN, RONI DERSOVITZ, )
17  FLOATING ASSETS, LTD., and PART 47, )
    INC.                                   )
18          Defendants.                    )
                                          )
19  _____ )

20                    **JURISDICTION AND VENUE**

21       1.     This Court has original jurisdiction of this lawsuit pursuant to 28 U.S.C. Section 1331

22  (federal question) and 18 U.S.C. Section 1961 et seq. (RICO Act). The Court also has jurisdiction

23  of this lawsuit based on 28 U.S.C. Section 1332 (diversity of citizenship).

24       2.     Venue in this District is proper because the contracts on which this suit is based were

25  entered into in San Diego County, California and the contractual agreements provide that any action

26  or proceeding brought arising out of the relevant agreements is to be filed in State or Federal Court

27  of competent jurisdiction located in San Diego County, California.

28

---------------------------------
Fourth Amended Complaint for Breach of Contract, etc.                          07CV1897

**PARTIES**

3.  Plaintiff, PACIFIC ROLLFORMING, LLC., doing business as TRAKLOC PACIFIC (hereinafter referred to as "TRAKLOC PACIFIC") is an Alaska Limited Liability Company doing business in the State of California and other states. Plaintiffs TODD BEASLEY ("BEASLEY") and CURT KINNEY ("KINNEY"), are individuals who reside in Alaska and Missouri, respectively, hold membership interests in TRAKLOC PACIFIC. Plaintiff ARCHITECTURAL METAL PRODUCTS, INC. ("AMP") is an Alaska corporation that holds a membership interest in TRAKLOC PACIFIC.

4.  Defendants MARC BERNSTEIN ("BERNSTEIN") and RONI DERSOVITZ ("DERSOVITZ") are individuals who reside outside the states of New York and New Jersey, respectively.

5.  DEFENDANT PART 47, INC. ("PART 47") was a purported corporation formed by BERNSTEIN and DERSOVITZ, among others. Plaintiff is informed and believes and on that basis alleges that all times herein mentioned, Part 47 was the alter ego of BERNSTEIN and DERSOVITZ, in that no corporate formalities were observed, said corporation was never capitalized, no bank accounts were ever opened by said corporation and the assets of BERNSTEIN and DERSOVITZ were intermingled with the assets of Part 47. By way of example, capital contributions that were made to Trakloc Pacific pursuant to agreement between Trakloc Pacific and Part 47 were in fact made directly by Dersovitz through his other controlled entities. As a result of this inadequate capitalization, commingling and failure to observe corporate formalities, Part 47 should be disregarded as a separate entity apart from BERNSTEIN and DERSOVITZ. Defendant FLOATING ASSETS, LTD ("FLOATING ASSETS") is an entity formed by DERSOVITZ to take control of the patent rights and intellectual property rights of the Trakloc system. Said entity is dominated and controlled by DERSOVITZ such that there is no separateness between the identity of the two, and FLOATING ASSETS is the alter ego of DERSOVITZ.

6.  Defendant TRAKLOC NORTH AMERICA, LLC (hereinafter referred to as "TLNA"), is a limited liability company with its principal place of business in the State of New Jersey. Plaintiffs are informed and believe and on that basis allege that Defendant TIN PLATE PURCHASING CORPORATION ("TIN PLATE") is a corporation with its principal place of

1  business in the state of New Jersey.

2    7.    Plaintiffs are informed and believe and on that basis allege that Defendant DAVID

3  JABLOW ("JABLOW") is an individual residing in the State of New Jersey. Plaintiffs are further

4  informed and believe and on that basis allege that  GARY NELSON ("NELSON") is an individual

5  residing in Tennessee and is the principal of Defendant SOUTHEASTERN METALS, Inc.("SEM"),

6  a licensee for the Trakloc product in the eastern United States. NELSON was a defendant in the

7  previous complaint filed herein, but is at this time the debtor in a pending chapter 11 Bankruptcy

8  proceeding in Tennessee. By reason of said fact,  NELSON is not named as a Defendant in this

9  Fourth Amended Complaint and Plaintiffs are seeking no affirmative relief against him. If

10  NELSON's bankruptcy proceeding is dismissed, Plaintiffs will seek leave to amend this complaint

11  to seek affirmative relief against NELSON. Plaintiffs are informed and believe and on that basis

12  allege that Defendant THOMAS HORST ("HORST")is an individual with his principal places of

13  business and principal residence in the state of Nevada.

14                                  **BACKGROUND FACTS**

15    8.    As of January 21, 2005, TRAKLOC INTERNATIONAL, LLC ("TLI") was the

16  exclusive holder of intellectual property rights in the United States for a method of manufacturing

17  structural members for steel framing for a product known as Trakloc.

18    9.    On January 21, 2005, TRAKLOC PACIFIC and TLI entered into an exclusive

19  agreement for the manufacture and sale of the Trakloc product in the states of Alaska, Hawaii,

20  Washington, Oregon, Nevada, Colorado, Kansas, Missouri, Minnesota and California. A true and

21  correct copy of that Master Area License Agreement is attached to the previously filed First

22  Amended Complaint as Exhibit "1" and incorporated therein by reference.

23    10.    On July 14, 2005, a second Master Area License Agreement was entered into between

24  TRAKLOC PACIFIC and TLI granting TRAKLOC PACIFIC the exclusive license for the

25  manufacture and sale of the Trakloc product in the states of Illinois and Wisconsin. A true and

26  correct copy of said Agreement is attached to the previously filed First Amended Complaint as

27  Exhibit "2" and incorporated therein by reference.

28    11.    On or about November, 2006, Pandora Select Partners, LP ("PANDORA")

------------------------------



1 represented to TRAKLOC PACIFIC that it had acquired the intellectual property rights of TLI as a
2 result of various financial transactions between PANDORA and TLI and had thereby become the
3 successor-in-interest to TLI. Based upon said representations, TRAKLOC PACIFIC is informed and
4 believes and on that basis alleges that PANDORA became a successor-in-interest to TLI.

5        12.     On or about July 13, 2007, TLNA represented that it had acquired the intellectual
6 property rights referenced in the Master Area License Agreements between TRAKLOC PACIFIC
7 and TLI and had on that basis become the successor-in-interest to TLI and PANDORA. Based upon
8 said representation, TRAKLOC PACIFIC is informed and believes and on that basis alleges that
9 TLNA is the successor-in-interest to both TLI and PANDORA. Based upon the representations of
10 DAVID JABLOW,  TRAKLOC PACIFIC is informed and believes and on that basis alleges that
11 DAVID JABLOW is an investor in and managing member of Defendant TLNA. Subsequent to the
12 filing of the Second Amended Complaint, TRAKLOC PACIFIC learned that TIN PLATE was a joint
13 purchaser of the intellectual property rights set forth in this paragraph with TLNA and is thus also
14 a successor-in-interest to both TLI and PANDORA.

15        13.     At all times mentioned in this complaint, all of the named Defendants knew that
16 TRAKLOC PACIFIC's manufacturing facility and thus its principal place of business was located
17 in Antioch, California and thus knew and intended that their acts would cause economic harm to
18 TRAKLOC PACIFIC in the state of California.

19        14.     Pursuant to the aforesaid agreements with TRAKLOC PACIFIC, TLI, PANDORA
20 and TLNA and TIN PLATE, as successive licensors of the Trakloc system, undertook numerous
21 obligations to TRAKLOC PACIFIC.  Included in those obligations were the obligation to (1)
22 develop national marketing programs for the products; (2) deliver to TRAKLOC PACIFIC in a
23 timely manner all tangible forms of technical information about the Trakloc system;  (3) advise
24 TRAKLOC PACIFIC of any national or regional marketing programs and allow TRAKLOC
25 PACIFIC to participate in such programs; (4) provide TRAKLOC PACIFIC with a complete set of
26 standardized marketing information; (5) promptly forward to TRAKLOC PACIFIC any and all leads,
27 inquiries or contracts related to the sale of products in the territory; (6) arrange for machines to
28 manufacture the products to be made available to TRAKLOC PACIFIC on an exclusive basis within

1    the licensed area; (7) obtain and maintain ICC-ES approval of the products manufactured by utilizing

2    the licensed technology and the necessary and updated applications of same; (8) provide TRAKLOC

3    PACIFIC written information about all improvements and enhancements to the system and (9)

4    protect the exclusive territory of Trakloc Pacific.

5    **FIRST CAUSE OF ACTION**

6    **(Breach of Contract - Trakloc Pacific against TLNA and TIN PLATE)**

7        15. Plaintiffs re-allege each and every allegation of Paragraphs 1 - 14 as though fully set forth

8    at this point.

9        16. TLI, PANDORA and TLNA and TIN PLATE, collectively, committed numerous

10    continuing material breaches of the aforesaid written contracts. Among those breaches are the

11    following:

12        (a)     They failed to develop national marketing programs for the products;

13        (b)     They failed to deliver sufficient technical information to TRAKLOC PACIFIC about

14    the Trakloc system as required in order to market and sell a steel framing system;

15        (c)     They failed to advise TRAKLOC PACIFIC of national or regional marketing

16    programs and failed, and continue to fail, to allow TRAKLOC PACIFIC to participate in such

17    programs;

18        (d)     They failed to provide TRAKLOC PACIFIC with complete sets of standardized

19    marketing information;

20        (e)     They have failed to forward to TRAKLOC PACIFIC all leads, inquires and/or

21    contacts related to sale of products in TRAKLOC PACIFIC's territory;

22        (f)     They failed to arrange for machines to be delivered to TRAKLOC PACIFIC that

23    would properly and completely manufacture the products to be sold by TRAKLOC PACIFIC in its

24    territory;

25        (g)     They failed to renew and update the ICC-ES approvals with respect to necessary

26    application of the Trakloc product and update the ICC-ES report in a timely manner, then attempted

27    to assert that failure as a ground for termination of TRAKLOC PACIFIC's license;

28        (h)     They failed to provide TRAKLOC PACIFIC written information about all

---

1 | improvements and enhancements to the systems;

2 |      (i)     They not only failed to protect the exclusive territory of TRAKLOC PACIFIC but
3 | they repeatedly engaged in directly and indirectly marketing, selling or distributing products into
4 | TRAKLOC PACIFIC's territory and continue to engage in such conduct.

5 |      17.     TRAKLOC PACIFIC orally notified TLI on several occasions in July of 2006 of its
6 | breaches of the agreement and notified TLI in writing on August 31, 2006 that TLI was in breach
7 | of the License Agreements. Thereafter, TRAKLOC PACIFIC engaged in repeated discussions with
8 | TLI, PANDORA and TLNA about their continuing breaches.  TRAKLOC PACIFIC has fully
9 | performed all things required of it under the contract, with the exception of payment of certain
10 | royalties which are excused as a result of TLNA's and TIN PLATE's numerous and continuing
11 | breaches.

12 |      18.     Despite said notifications, Defendants TLNA and TIN PLATE failed and refused to
13 | cure said breaches and remain in breach of the Agreements.

14 |      19.     In reliance on the representations in the Agreements and in reliance on the licensors'
15 | performance of their obligations under the Agreements, TRAKLOC PACIFIC has expended millions
16 | of dollars in commencing a manufacturing facility, developing and marketing the product within its
17 | territory, developing distributorship networks, assisting in the performance of numerous tests on the
18 | product that the successive licensors failed to perform and or pay for in a timely manner in order to
19 | obtain proper certifications and acceptance in the market and otherwise developing a market for the
20 | Trakloc product. TRAKLOC PACIFIC has been damaged by the successive licensors' numerous
21 | breaches in the form of monies spent in reliance on the successive licensors' performance over a
22 | period of approximately four years on a product that was not ready to be marketed as well as
23 | expenditures required to attempt to cure or mitigate the damages caused by the successive licensors'
24 | numerous acts of non-performance, as well as lost profits for sales that would have been made had
25 | Defendants performed as promised.

26 |      20.     By reason of TLNA's and TIN PLATE's breaches of contract, TRAKLOC PACIFIC
27 | has been damaged in amounts which have not been fully ascertained. TRAKLOC PACIFIC is
28 | informed and believes that the amount of its damages by reason of Defendant's breaches exceeds

1   $5,000,000.00.  TRAKLOC PACIFIC will offer proof of the amount of said damages at the time of
2   trial herein.

3                                   **SECOND CAUSE OF ACTION**

4                        **(Fraud, Misrepresentation and Non-Disclosure - Trakloc Pacific**

5                                    **Against TLNA and TIN PLATE)**

6        21.    Plaintiffs reallege and incorporate herein by reference each and every allegation
7   contained in Paragraphs 1 through 20 as though fully set forth at this point.

8        22.    In entering into the Master Area License Agreements with TRAKLOC PACIFIC, TLI
9   expressly represented that TRAKLOC PACIFIC was being granted an exclusive license for the
10  manufacture and sale of the products within the territories described in the agreements.  TLI failed
11  to disclose the fact that it had previously entered into an agreement with a third party to be the
12  exclusive licensee of the Trakloc product in certain states for which the license was being granted
13  to TRAKLOC PACIFIC.  TLI further failed to disclose to TRAKLOC PACIFIC that it had entered
14  into a rescission agreement of the prior license agreement, had failed to obtain a signed written
15  rescission of that agreement and had further failed to comply with the terms of the rescission
16  agreement, resulting in competing claims on TRAKLOC PACIFIC's license rights.

17       23.    TLI further failed to disclose that it had guaranteed a $3,600,000.00 loan from
18  PANDORA or a related party to a licensee of TLI, Southeastern Metals, Inc. and that all of the
19  intellectual property assets of TLI had been pledged as security on that loan.  Said disclosure was
20  extremely material to the transaction with TRAKLOC PACIFIC in that as a result of this prior
21  agreement, TLI was required to utilize royalty payments made by TRAKLOC PACIFIC to service
22  this loan (which was ultimately defaulted in any event) rather than doing the testing, engineering and
23  marketing required of it under its agreement with TRAKLOC PACIFIC.

24       24.    The aforesaid misrepresentations and non-disclosures occurred during negotiations
25  between TODD BEASLEY on behalf of TRAKLOC PACIFIC and Richard Knecht and Albert Hill
26  as employees and/or representatives of TLI during the period February of 2004 through July 14,
27  2005, when the second license agreement was signed. The aforesaid misrepresentations and non-
28  disclosures were material in that had TRAKLOC PACIFIC known the true facts, it would not have

------------------------------

1   entered into the license agreements under the terms as set forth in those agreements and would not

2   have expended the substantial sums that it has expended in attempting to develop and market the

3   Trakloc system.

4          25.     Defendants TLNA and TIN PLATE are jointly and severally liable with TLI for the

5   aforesaid representations in that they are the successors-in-interest to TLI insofar as the rights and

6   obligations under the Master Area License Agreements and in that they failed to take the affirmative

7   steps necessary to protect the contractual and territorial rights of TRAKLOC PACIFIC and complete

8   the rescission agreement with the third party, but rather conspired with the very parties violating

9   those territorial rights to put TRAKLOC PACIFIC out of business.

10         26.     By reason of the aforesaid misrepresentations and omissions, TRAKLOC PACIFIC

11  has sustained damages in excess of $5,000,000.00 by reason of the expenditures made and reliance

12  on the truth of the representations and by reason of the interference with TRAKLOC PACIFIC's

13  ability to effectively market and sell the product by reason of the conflicting claims of third parties.

14  TRAKLOC PACIFIC will offer proof of the exact amount of damages sustained at the time of trial

15  herein.

16                          **THIRD CAUSE OF ACTION**

17                **(Breach of Implied Covenant of Good Faith and Fair Dealing**

18                        **- Trakloc Pacific Against TLNA)**

19         27.     Plaintiffs reallege and incorporate herein by reference each and every allegation of

20  Paragraphs 1 through 26 as though fully set forth at this point.

21         28.     After TLNA's purported acquisition of the Trakloc technology, TRAKLOC PACIFIC

22  and Defendant TLNA entered into a series of negotiations for the purported purpose of resolving

23  differences between them and moving forward cooperatively for the effective development,

24  marketing and sale of the Trakloc products.  On or about September 11, 2007, after a series of

25  personal and telephonic meetings, TRAKLOC PACIFIC and Defendant had orally agreed on nearly

26  all of the essential terms for moving forward.

27         29.     TRAKLOC PACIFIC is informed and believes and on that basis alleges that in fact

28  those negotiations and meeting were a pretext and a subterfuge on the part of Defendant TLNA to

1  obtain confidential information about TRAKLOC PACIFIC for the purpose of utilizing that

2  information as part of Defendant's efforts to put TRAKLOC PACIFIC out of business and seize all

3  of the work done by TRAKLOC PACIFIC in developing the product, as well as the territories of

4  TRAKLOC PACIFIC. On the following day (which coincidentally was the date on which Defendant

5  TLNA knew TRAKLOC PACIFIC's counsel would be leaving for a five day vacation in Hawaii

6  with his family), Defendant TLNA began its publication of a series of letters and emails declaring

7  TRAKLOC PACIFIC in default, terminating TRAKLOC PACIFIC's License Agreements, denying

8  Defendant any access to information about the product, denying TRAKLOC PACIFIC the right to

9  sell or distribute the product, denying TRAKLOC PACIFIC any rights to participate in the marketing

10 efforts of the product and denying TRAKLOC PACIFIC the right to attend the Metalcon convention

11 in Las Vegas commencing October 5, 2007. Defendant TLNA further began immediately publishing

12 to third parties disparaging comments about TRAKLOC PACIFIC's conduct as well as confidential

13 information about TRAKLOC PACIFIC's finances in an effort to discourage third parties from

14 continuing with or commencing to do any business with TRAKLOC PACIFIC.

15      30.     In every contract there is a covenant of good faith and fair dealing to the effect that

16 both parties will cooperate towards effecting the goals of the contract and that neither party will

17 commit any act to frustrate the goals and purposes of the contract.

18      31.     The foregoing acts of Defendant TLNA caused substantial damage to TRAKLOC

19 PACIFIC in the form of its efforts to continue to do business and to raise needed capital and resulted,

20 along with the acts of the other Defendants named herein, in the failure of TRAKLOC PACIFIC's

21 business and the closure of TRAKLOC PACIFIC's business operation.

22      32.     TRAKLOC PACIFIC will offer proof of the amount of said damages at trial.

23 TRAKLOC PACIFIC is informed and believes and on that basis alleges that said damages are in

24 excess of $20,000,000.00.

25                          **FOURTH CAUSE OF ACTION**

26          **(Defamation - Trakloc Pacific against TLNA, JABLOW, SEM and HORST )**

27      33.     Plaintiffs reallege and incorporate herein by reference each and every allegation

28 contained in Paragraphs 1 through 32.

-----------------------------

34.     Commencing on or before September of 2007, Defendants TLNA, JABLOW, SEM, and HORST and Gray Nelson entered into a conspiracy to destroy TRAKLOC PACIFIC and put TRAKLOC PACIFIC out of business by defaming TRAKLOC PACIFIC through false statements about its certification as a manufacturer of the Trakloc product and that it had no right to manufacture or sell the Trakloc product as well as other false statements. Defendants TLNA, JABLOW, NELSON and HORST, and Gary nelson pursuant to this conspiracy, have engaged in numerous acts of libel and slander against TRAKLOC PACIFIC by the written and oral publication of said libelous or slanderous comments to third parties, including other Trakloc licensees, vendors to TRAKLOC PACIFIC, distributors of TRAKLOC PACIFIC and customers or potential customers of TRAKLOC PACIFIC. Among those publications are the following:

(a)     That TRAKLOC PACIFIC is in default under license agreements with TLNA;

(b)     That TRAKLOC PACIFIC lacks proper ICC-ES certification and is illegally selling its products;

(c)     That TRAKLOC PACIFIC is unable to meet its product delivery commitments and that as a result TLNA and the other co-conspirators have the right to deal directly with TRAKLOC PACIFIC's customers;

(d)     That TRAKLOC PACIFIC had no right to attend the national Metalcon convention in Las Vegas commencing October 3, 2007 as a representative of the Trakloc system; and

(e)     That TLNA and SEM were taking over TRAKLOC PACIFIC's business and customers and would be servicing all of TRAKLOC PACIFIC's markets.

35.     The aforesaid publications and representations were all false and defamatory and intended to be defamatory. Said representations were willful and malicious in that their intent is to put TRAKLOC PACIFIC out of business thereby allowing TLNA and SEM to seize TRAKLOC PACIFIC's territory and the fruit of all of TRAKLOC PACIFIC's expenditures and effort. Gary Nelson and HORST participated in the conspiracy by attending meetings with JABLOW and TRAKLOC PACIFIC's distributor in Las Vegas, Cal Ply, and meetings with JABLOW and TRAKLOC PACIFIC's primary end user in the fall of 2007, Aderholt Specialties, in which the above defamatory comments were made. SEM participated in the conspiracy by entering into

1  agreements with the other co-conspirators to make and ship products to Cal Ply for servicing the

2  Aderholt account as well as to other customers in the territory in knowing violation of TRAKLOC

3  PACIFIC's exclusive territorial rights. NELSON and HORST also participated in the conspiracy by

4  directly contacting Aderholt and other potential customers for the purpose of selling product from

5  SEM by telling said third parties the same false and defamatory comments set forth in paragraph 34.

6  As a result of said acts, TRAKLOC PACIFIC has been driven out of business.

7      36.    By reason of said acts of libel and slander, TRAKLOC PACIFIC has been damaged

8  in an amount to be proved at the time of trial herein, but believed to be in excess of $20,000,000.

9      37.    By reason of the willful, deliberate and malicious nature of the conduct of

10  Defendants, TRAKLOC PACIFIC is entitled to exemplary damages against Defendants, and each

11  of them jointly and severally, in an amount of at least $50,000,000.00.

12                          **FIFTH CAUSE OF ACTION**

13          **(Interference with Contract/Prospective Business Advantage - Trakloc**

14              **Pacific Against TLNA , JABLOW, SEM, TIN PLATE and HORST)**

15      38.    Plaintiffs reallege and incorporate herein by reference each and every allegation

16  contained in Paragraphs 1 through 37 as though fully set forth at this point.

17      39.    The acts of Defendants TLNA, JABLOW, SEM, NELSON and HORST and Gary

18  Nelson, as heretofore alleged, were entered into with the express purpose of putting TRAKLOC

19  PACIFIC out of business by disrupting its relationship with its distributors, customers and potential

20  customers, as well as potential investors in TRAKLOC PACIFIC, and had the effect of not only

21  interfering with and disrupting those relationships, but ultimately of putting TRAKLOC PACIFIC

22  out of business.

23      40.    Said acts were willful and malicious in that they were performed for the express

24  purpose of putting TRAKLOC PACIFIC out of business and relieving TLNA and TIN PLATE of

25  their contractual obligations as the successor-in-interest to the license agreements with TRAKLOC

26  PACIFIC and thereby seizing TRAKLOC PACIFIC's business opportunities for themselves.

27      41.    In addition to the forgoing, TLNA, JABLOW, SEM, Gary Nelson, TIN PLATE and

28  HORST  conspired among themselves to ship product into TRAKLOC PACIFIC's territory in

1  violation of the License Agreements and Southeastern's license agreement and   informed
2  TRAKLOC PACIFIC's distributor and the customers of said distributor that they would supply said
3  distributor and customers with product, which sales and marketing efforts were in violation of said
4  agreements.

5      42.    By reason of said acts, TRAKLOC PACIFIC has been damaged in an amount to be
6  proved at the time of trial, but believed to be in excess of $20,000,000.00.

7      43.    By reason of the willful, oppressive and malicious nature of the acts of said
8  Defendants, TRAKLOC PACIFIC is entitled to exemplary damages against each of them jointly and
9  severally, in an amount to be determined by the trier of fact. TRAKLOC PACIFIC believes that said
10  sum should be in excess of $50,000,000.00.

11                              **SIXTH CAUSE OF ACTION**

12                  **(RICO Act violations - Trakloc Pacific against TLNA,**

13                          **JABLOW, SEM and HORST)**

14      44.    Plaintiffs reallege and incorporate herein by reference each and every allegation
15  contained in Paragraphs 1 through 43 as though fully set forth at this point.

16      45.    TRAKLOC PACIFIC is informed and believes and on that basis alleges that
17  commencing on or before September of 2007, Defendants TLNA, JABLOW, SEM, NELSON and
18  HORST formed a scheme to put TRAKLOC PACIFIC out of business and thereby take over for
19  themselves the backlog of over $20,000,000.00 in business in the Nevada market alone developed
20  by TRAKLOC PACIFIC.

21      46.    Pursuant to that scheme, said Defendants used the United States mails and wires to
22  interfere with and disrupt TRAKLOC PACIFIC's contractual relationships through revealing
23  confidential information about TRAKLOC PACIFIC, falsely claiming that TRAKLOC PACIFIC
24  was in default under its license agreements and that TRAKLOC PACIFIC's licenses would be
25  terminated, falsely and fraudulently asserting that:

26      (a)    TRAKLOC PACIFIC was not meeting its obligations to its customers;

27      (b)    TRAKLOC PACIFIC had not obtained prior ICC certifications and therefore was
28  required to cease and desist from manufacturing, distributing or selling additional products to its

1 | customers; and

2 |     (c)    That a supplier of TRAKLOC PACIFIC should no longer supply a product to
3 | TRAKLOC PACIFIC.

4 |     47.    Those representations were made, inter alia, in various e-mails and telephone
5 | conversations from DAVID JABLOW to TRAKLOC PACIFIC's distributor in Las Vegas, to a sub-
6 | licensee of TLNA in Ohio that was selling product to TRAKLOC PACIFIC, and to TRAKLOC
7 | PACIFIC's sub-licensee in the Illinois/Wisconsin/Minnesota territory. Specific acts of
8 | misrepresentation are as follows:

9 |     (a)    email from JABLOW to CalPly sent September 12, 2007 informing CalPly that
10 | TRAKLOC PACIFIC had been defaulted.

11 |     (b)    email from JABLOW to CalPly sent September 21, 2007 advising CalPly about a
12 | problem with TRAKLOC PACIFIC's ICC certification falsely asserting that such a problem existed.

13 |     (c)    email from JABLOW to CalPly sent October 1, 2007 reiterating TLNA's default of
14 | TRAKLOC PACIFIC and offering to supply the product from SEM's plant.

15 |     (d)    email from JABLOW to CalPly sent October 15, 2007 informing CalPly that
16 | JABLOW was going directly to meet with contractors in Las Vegas.

17 |     (e)    email from JABLOW to CalPly sent October 19, 2007 requesting CalPly's product
18 | needs over the next 30 days.

19 |     (f)    email from JABLOW to CalPly sent October 21, 2007 supplying leads from the
20 | Metalcon show.

21 |     (g)    email from JABLOW to CalPly sent October 23, 2007 asking for Adderholt's
22 | requirements on the Center City job going forward so that he could start to schedule production.
23 | Pursuant to the conspiracy among the Defendants, production for the jobs would come from the SEM
24 | plant ran by Nelson in Tennessee.

25 |     (h)    email from JABLOW to CalPly sent October 23, 2007 falsely asserting that
26 | TRAKLOC PACIFIC had shipped steel to CalPly that did not qualify for Leeds credits.

27 |     (i)    email from JABLOW to CalPly sent October 31, 2007 asking when TLNA would be
28 | set up as a vendor.

(j)      email from JABLOW to CalPly sent November 5, 2007 informing CalPly TLNA was working on setting up a facility in Las Vegas. As part of the conspiracy, NELSON and HORST were to be involved in the operation of the facility.

(k)      email from JABLOW to CalPly sent November 5, 2007 discussing product needs on various Las Vegas jobs and discussing the involvement of NELSON and SEM in supplying the product for those job needs.

(l)      email from JABLOW to CalPly sent November 5, 2007 discussing product requirement and placing orders.

(m)     email from JABLOW to CalPly sent November 6, 2007 indicating Bert Tabor, a co-conspirator with JABLOW and an employee of TLNA, was on his way to the facility to inventory the Trakloc product in stock.

(n)      email from JABLOW to CalPly sent November 6, 2007 asserting CalPly should not be still receiving product from TRAKLOC PACIFIC both because TRAKLOC PACIFIC had been terminated and because TRAKLOC PACIFIC was falsely labeling its product as ICC certified.

(o)      email from JABLOW to CalPly sent November 6, 2007 again falsely asserting that TRAKLOC PACIFIC lacked proper ICC certification and that allowing TRAKLOC PACIFIC to continue to ship product was creating a potential problem for CalPly.

(p)      email from JABLOW to Cal Ply sent November 7, 2007 requesting CalPly's quotes to Adderholt, indicating that Nelson had a copy of the quote but wasn't there so he couldn't attach it.

(q)      email from JABLOW to the other TRAKLOC licensees sent September 14, 2007 falsely asserting that TRAKLOC PACIFIC was not meeting its commitments to its customers.

(r)      telephone call from JABLOW to CalPly made on September 21, 2007 in which JABLOW falsely told CalPly that the only ICC certified plants authorized to ship the Trakloc product were the Ohio plant and the SEM plant in Tennessee.

(s)      letter from TLNA's attorney to the TRAKLOC licensee in Ohio sent October 8, 2007 wrongfully directing the licensee to cease shipping product to TRAKLOC PACIFIC that Defendants knew was essential to TRAKLOC PACIFIC's fulfilling it's contracts in Las Vegas.

1       These acts, among others, caused TRAKLOC PACIFIC to lose CalPly, its Las Vegas
2  distributor, ultimately putting TRAKLOC PACIFIC out of business.

3       48.    All of the aforesaid representations made by letter, e-mail and telephone were false
4  and knowingly false and were made with the specific intent to deceive the third parties to whom the
5  representations were made for the purpose of depriving TRAKLOC PACIFIC of business and
6  causing TRAKLOC PACIFIC to be unable to continue business operations so that TLNA could
7  thereby seize TRAKLOC PACIFIC's territory and profit therefrom.

8       49.    As a result of the foregoing acts of wire and mail fraud by TLNA, through the
9  assistance of the individual co-conspirators, TRAKLOC PACIFIC has lost business and prospective
10  business to its monetary damage.  Said acts of Defendants forced TRAKLOC PACIFIC out of
11  business which resulted in the loss of the entire value of the business and the future anticipated
12  profits of the business.  TRAKLOC PACIFIC will offer proof of these amounts at the time of trial
13  herein, but believes that they are in excess of $20,000,000.00.

14       50.    Pursuant to 18 USC §1964(c), TRAKLOC PACIFICs request that any damages
15  awarded against Defendant by reason of this cause of action be trebled.

16                **SEVENTH CAUSE OF ACTION**

17         **( Declaratory Relief - Trakloc Pacific Against TLNA and TIN PLATE)**

18       51.    Plaintiffs reallege and incorporate herein by reference each and every allegation
19  contained in Paragraphs 1-50 as though fully set forth at this point.

20       52.    An actual controversy now exists between TRAKLOC PACIFIC and Defendants
21  TLNA and TIN PLATE concerning the rights and duties of the parties with respect to the Master
22  Area License Agreements referenced above. TRAKLOC PACIFIC contends that TLNA and TIN
23  PLATE and their predecessors have breached said agreements and that until those breaches are cured
24  TRAKLOC PACIFIC is excused from paying advance or other royalties under those agreements.
25  TLNA and TIN PLATE contend that they are not in breach of those agreements and that they have
26  a right to terminate TRAKLOC PACIFIC's licenses for monetary and non-monetary breaches of
27  those agreements. TLNA and TIN PLATE further contend that they are not required to follow
28  Section 20.2 of the original license agreement with respect to monetary defaults. TRAKLOC

1    PACIFIC contends that TLNA and TIN PLATE are required to follow those procedures and that if

2    TRAKLOC PACIFIC is determined to be in monetary default it has a right to cure that default.

3         53.    TRAKLOC PACIFIC desires a judicial determination of its rights and duties under

4    the two Master Area License agreements as well as the duties of TLNA and TIN PLATE under same.

5         54.   A judicial declaration is necessary and appropriate at this time in order that the parties

6    may ascertain their rights and duties under the Master Area License Agreements.

7    **EIGHTH CAUSE OF ACTION**

8    **(Fraud and Deceit-By all Plaintiffs against PART 47, Bernstein, Dersovitz, Jablow and TLNA)**

9         55.    Plaintiffs reallege and incorporate herein by reference each and every allegation

10   contained in Paragraphs 1 through 54.

11        56.    On or about September 11, 2007, BERNSTEIN, DERSOVITZ and others entered into

12   an agreement (the " Pre-incorporation Agreement"). Said agreement provided for the contribution

13   of the Trakloc intellectual property rights by the holder of the patent and intellectual property rights

14   into a newly formed entity (which subsequently was formed as PART 47 and provided for the

15   bringing of a lawsuit by the new entity against PANDORA and JABLOW for the purpose of

16   terminating TLNA's rights as a licensor (and thereby presumably terminating TRAKLOC

17   PACIFIC's rights as a sublicensor). A true and correct copy of said agreement is attached to this

18   complaint as Exhibit "1". During this same period of time, DERSOVITZ and BERNSTEIN

19   repeatedly urged TRAKLOC PACIFIC to combine in some fashion with their new entity with the

20   ultimate goal of combining all of the technical rights under common ownership.

21        57.    On October 26, 2007, TRAKLOC PACIFIC entered into an agreement with PART

22   47 wherein PART 47 acquired a membership interest in TRAKLOC PACIFIC. As an inducement

23   to enter into said agreement, DERSOVITZ, in October of 2007, promised and represented to

24   TRAKLOC PACIFIC that he would advance the necessary funds to PART 47, provide the necessary

25   funds on an ongoing basis required to meet the continuing obligations and operational costs of

26   TRAKLOC PACIFIC, including rent, material costs, payroll, equipment lease payments, utilities,

27   shipping and other essential payments including litigation costs. DERSOVITZ further promised and

28   represented that through PART 47 he would take the necessary steps to remove the individual and

1   corporate guarantors of the obligations of TRAKLOC PACIFIC from any individual responsibility

2   for those obligations. DERSOVITZ also promised and represented that he would, through PART

3   47, advance the sum of at least $3,000,000.00 to TRAKLOC PACIFIC as the capital contribution

4   of PART 47 for that membership interest. A true and correct copy of this agreement is attached to

5   this complaint as Exhibit "2".

6       58.    Plaintiffs TRAKLOC PACIFIC, KINNEY, BEASLEY and AMP reasonably relied

7   on said representations and would not have entered into the agreement with PART 47 had said

8   representations not been made.

9       59.    Pursuant to said agreement, DERSOVITZ was to take over the financial management

10  of TRAKLOC PACIFIC, including the payment of TRAKLOC PACIFIC invoices. Pursuant to said

11  agreement and at the request of DERSOVITZ, TRAKLOC PACIFIC sent all of its financial

12  information to DERSOVITZ and uploaded same to DERSOVITZ's server at his request.

13      60.    Thereafter, in January of 2008, TLNA and PART 47 entered into a Binding Letter of

14  Intent to combine their two entities. Pursuant to said agreement, a new entity TRAKLOC

15  AMERICA, LLC. was formed, purportedly acquiring the assets and obligations of both TLNA and

16  PART 47.

17      61.    In February of 2007, the principals of TRAKLOC AMERICA met in Australia with

18  BEASLEY on behalf of TRAKLOC PACIFIC. At this meeting, DERSOVITZ again committed to

19  funding the balance of the $3,000,000.00 committed in the Pre-incorporation Agreement and the

20  agreement between PART 47 and TRAKLOC PACIFIC, promising that it would be funded by April

21  2, 2008.

22      62.    Despite the foregoing promises, DERSOVITZ repeatedly failed and refused to supply

23  funding as promised in the various agreements and Will Andrews and Wiltin Pty Ltd.("Wiltin") on

24  June 24, 2008 served notice of default of their agreement to contribute the Trakloc patents and

25  technical rights to PART 47 and or TRAKLOC AMERICA. On July 27, 2008 Will Andrews and

26  Wilton sent Dersovitz a letter advising him that his failure to perform would result in a default and

27  possible forfeiture of his shares.

28      63.    At the times DERSOVITZ made the representations set forth in Paragraph 57, he had

------------------------------

1   no intent of performing same, but rather made same with the intent of tying up TRAKLOC PACIFIC

2   into an agreement with PART 47, the entity controlled by he and BERNSTEIN, and taking financial

3   control of TRAKLOC PACIFIC.

4         64.    In late June of 2008, DERSOVITZ indicated to TRAKLOC PACIFIC that he would

5   no longer fund PART 47 or TRAKLOC PACIFIC in accordance with his previous promises.

6   DERSOVITZ then proposed that TRAKLOC PACIFIC, TLNA and an entity to be formed by

7   DERSOVITZ combine into a new limited liability company which would hold all of the patents and

8   license rights to the Trakloc technology.  DERSOVITZ proposed that he or the new entity to be

9   formed by him would be willing to purchase the Trakloc patent and intellectual property rights from

10   Wiltin and Andrews for the sum of $1.25 million dollars and that he would contribute $750,000.00

11   to the new entity which would be used to pay the ongoing expenses of the TRAKLOC PACIFIC

12   operation.  DERSOVITZ further proposed that his new entity, TLNA and TRAKLOC PACIFIC

13   would each have roughly equal membership interests depending on the amount of monies previously

14   expended on Trakloc matters.  DERSOVITZ requested as part of his proposal that BEASLEY assist

15   him in acquiring the Andrews and Wiltin patents and intellectual property rights because he felt

16   Andrews disliked him and would not deal with him.  TRAKLOC PACIFIC, through BEASLEY,

17   accepted this offer and agreed to attempt to obtain the patent rights and intellectual technology from

18   Andrews and Wiltin. TLNA also accepted said proposal.

19         65.    Based upon the oral commitments and promises of DERSOVITZ, BEASLEY

20   negotiated and facilitated the making and execution of a formal agreement between Wiltin and

21   Andrews and FLOATING ASSETS, whereby FLOATING ASSETS purchased the Trakloc patent

22   and intellectual property rights from Wiltin and Andrews for the agreed sum of $1,250,000.00.

23   Subsequent to the consummation of this purchase, DERSOVITZ again refused to fulfill his promises

24   and enter into the promised roll-up agreement, instead repeatedly changing the terms of the deal to

25   ultimately one where he would provide no funding for or any assumption of existing TRAKLOC

26   PACIFIC debt and included other provisions that he knew would be impossible for TRAKLOC

27   PACIFIC to accept.  Instead, DERSOVITZ joined JABLOW and TLNA in their scheme to force

28   TRAKLOC PACIFIC out of business and take over the assets and license rights of TRAKLOC

1   PACIFIC. TRAKLOC PACIFIC is informed and believes that TLNA and FLOATING ASSETS
2   have entered into an agreement to combine their assets and interests in the Trakloc system pursuant
3   to said scheme and conspiracy.

4       66.    At the time DERSOVITZ made the promises to BEASLEY and TRAKLOC
5   PACIFIC, he had no intention of performing them. BEASLEY and TRAKLOC PACIFIC reasonably
6   relied on said promises and fully performed their part of the oral agreement by acquiring the patents
7   and intellectual property technology for DERSOVITZ.

8       67.    By reason of DERSOVITZ' fraud and deceit, and the conspiracy among
9   DERSOVITZ, FLOATING ASSETS, TLNA and JABLOW. TRAKLOC PACIFIC was left in a
10   position of having no operating capital and was required to cease operations.

11      68.    By further reason of the fraud and deceit of DERSOVITZ, BERNSTEIN, FLOATING
12   ASSETS, TLNA and JABLOW, Plaintiffs AMP, BEASLEY and KINNEY have been damaged by
13   the loss of their entire investment and advances in and to TRAKLOC PACIFIC, as well as the sums
14   owed to BEASLEY and KINNEY in the form of unpaid wages and loans. AMP, BEASLEY and
15   KINNEY will offer proof of the amount of such losses at the time of trial, but are informed and
16   believe and on that basis allege that said losses, including the loss of value of their membership
17   interests in TRAKLOC PACIFIC, is in excess of $5,000,000.00 to each party .

18      69.    By reason of the fraud and deceit of DERSOVITZ, FLOATING ASSETS, TLNA and
19   JABLOW, Plaintiff TRAKLOC PACIFIC has been damaged by being unable to continue its
20   operations and loss of its plant and equipment as well as the loss of its goodwill and value as an
21   ongoing entity. TRAKLOC PACIFIC will offer proof of the amount of damages at the time of this
22   trial, but believes said damages are in excess of $20,000,000.00.

23      70.    By reason of the fraudulent, willful and malicious nature of the fraud, deceit and
24   misrepresentations of DERSOVITZ, Plaintiffs are entitled to exemplary damages in the discretion of
25   the trier of fact, but believed to be in excess of $50,000,000.00.

26                          **NINTH CAUSE OF ACTION**

27      **(Damages Based on Rescission-All Plaintiffs Against Bernstein, Dersovitz and Part 47)**

28      71.    Plaintiffs re-allege and incorporate herein by reference each and every allegation

---

1   contained in Paragraphs 1 through 70.

2        72.    Part 47 and its alter-egos, BERNSTEIN and DERSOVITZ, breached the agreement
3   to purchase with TRAKLOC PACIFIC described in Paragraph 57 of this Complaint in numerous
4   ways. Among the breaches were the following:

5        (a)    PART 47 failed to provide necessary funds for TRAKLOC PACIFIC to meet its
6   ongoing obligations as promised by Paragraph 2(b) of the agreement;

7        (b)    DERSOVITZ failed to fulfill his duties as co-manager in charge of financial matters
8   as required by Paragraph 2(g) of the agreement;

9        (c)    Defendants failed to take the necessary steps to remove BEASLEY, KINNEY, AMP
10  and principals of the other member of TRAKLOC PACIFIC from the personal guarantees on the
11  equipment leases and the property lease; and

12       (d)    PART 47 and DERSOVITZ failed to contribute $3,000,000.00 to TRAKLOC
13  PACIFIC as a capital contribution as required by Paragraph 2(c) of the agreement.

14       73.    Pursuant to the Trakloc Pre-Incorporation Agreement described in Paragraph 56 of this
15  Complaint, in the event DERSOVITZ failed to contribute the sum of $3,000,000 to the company, he
16  was to be given five days written notice and his shares were thereafter to revert to the remaining
17  shareholders. In actuality, despite DERSOVITZ's continued failure to live up to his monetary
18  obligations with respect to the company, his interest in PART 47 was never taken away from him and
19  he continued to act on behalf of Part 47 up through the time of his negotiations with TRAKLOC
20  PACIFIC described in Paragraph 64 of this Complaint, at which time he announced his intention to
21  abandon Part 47.

22       74.    By letter dated October 27, 2008, and pursuant to the agreement with DERSOVITZ
23  described in Paragraph 64 of this Complaint, Trakloc Pacific rescinded the Agreement to Purchase
24  with Part 47 and announced its intent to seek damages from the responsible parties

25       75.    In reliance on the aforesaid misrepresentations by DERSOVITZ and breaches of
26  contract on the part of PART 47 and DERSOVITZ, TRAKLOC PACIFIC did not seek other needed
27  funding for its operations, which it could have obtained. As a result of the continued course of
28  wrongful conduct by DERSOVITZ, TRAKLOC PACIFIC has been required to close its doors and

1  cease operations. TRAKLOC PACIFIC will offer proof of the amount of damages at the time of trial,
2  but believes said damages are in excess of $10,000,000.00.

3      76.      AMP, BEASLEY and KINNEY, as third party beneficiaries of said agreement have
4  likewise been damaged by the failure of Defendants, Part 47, DERSOVITZ and BERNSTEIN to
5  remove them from the personal guarantees on the equipment leases in that  had TRAKLOC PACIFIC
6  obtained outside financing and continued in business the guarantees would have been satisfied.
7  Instead, they have suffered personal liability on them.  Said Plaintiffs will offer proof of the amount
8  of said damages at the time of trial herein, but believes said damages are in excess of $1,000,000.00.

9                          **TENTH CAUSE OF ACTION**

10          **( Breach of Contract - Trakloc Pacific Against Dersovitz and Floating Assets)**

11      77.      Plaintiffs re-allege and incorporate herein by reference each and every allegation
12  contained in Paragraphs 1 through 76.

13      78.      Pursuant to the oral agreement entered into among TRAKLOC PACIFIC,
14  DERSOVITZ and TLNA, DERSOVITZ, FLOATING ASSETS and TLNA agreed to form a new
15  limited liability company with TRAKLOC PACIFIC that would have roughly equal ownership
16  interests (but based on monies expended on the Trakloc venture), with an obligation on the part of
17  DERSOVITZ to contribute the sum of $750,000.00 for ongoing operations to allow the new entity
18  time to obtain additional investment.  TRAKLOC PACIFIC fully performed its part of the oral
19  agreement by obtaining for FLOATING ASSETS the Trakloc patents and intellectual property rights
20  from Wiltin and Andrews, as well as the stock of Wiltin, for the agreed sum of $1,250,000.00.

21      79.      DERSOVITZ and FLOATING ASSETS breached said agreement by refusing to enter
22  into the roll-up agreement with TRAKLOC PACIFIC on the agreed upon terms.  TRAKLOC
23  PACIFIC is informed and believes and on that basis alleges, that DERSOVITZ and/or his alter ego,
24  FLOATING ASSETS, instead entered into an agreement with TLNA to combine FLOATING
25  ASSETS and TLNA into a single entity.

26      80.      DERSOVITZ was well aware that his refusal to honor his promises would cause
27  TRAKLOC PACIFIC to go out of business and in fact intended that consequence.

28      81.      By reason of the breach of DERSOVITZ and FLOATING ASSETS, TRAKLOC

-----------------------------

1  PACIFIC has been damaged by the loss of both the funds necessary to continue its operations and by

2  the loss of the value of its percentage interest in an entity that would have owned the technology and

3  license rights of the TRAKLOC product. TRAKLOC PACIFIC will offer proof of the amount of its

4  damages at the time of trial, but believes said damages to be in excess of $20,000,000.00.

5                              **ELEVENTH CAUSE OF ACTION**

6                         **(Conversion - Trakloc Pacific against Dersovitz)**

7        82.     Plaintiffs re-allege and incorporate herein by reference each and every allegation

8  contained in Paragraphs 1 through 81.

9        82.     On two occasions when DERSOVITZ was purportedly acting as financial manager

10  of TRAKLOC PACIFIC, he improperly removed funds from TRAKLOC PACIFIC's bank account

11  and converted them to his own use. On February 1, 2008 he withdrew $430,000 from said account

12  and converted same to his own use. On Monday, February 4, 2008, he replaced said funds. However

13  on the same date, DERSOVITZ then wrongfully withdrew $100,000.00 from said bank account and

14  converted same to his own use. Said money was never replaced despite promise on the part of

15  DERSOVITZ to do so.  In September or October of 2008, DERSOVITZ then wrongfully took the

16  remaining balance out of said account and closed same.

17       83.     Said withdrawals and conversions were wrongful and intentional by DERSOVITZ.

18  By reason of same, TRAKLOC PACIFIC has been damaged in the amount of $100,000.00 by reason

19  of the wrongful conversion of funds that were never replaced.

20       84.     By reason of the intentional and willful nature of said wrongful conduct, TRAKLOC

21  PACIFIC is entitled to exemplary damages in the sum of $500,000.00, or such other sum that may

22  be determined by the trier of fact.

23                              **TWELFTH CAUSE OF ACTION**

24              **(Interference With Prospective Business Advantage - Trakloc Pacific**

25                              **Against Dersovitz and Jablow)**

26       85.     Plaintiffs reallege and incorporate herein by reference each and every allegation

27  contained in Paragraphs 1 through 84.

28       86.     Subsequent to Trakloc's Pacific cessation of business TRAKLOC PACIFIC entered

1  into negotiations with its largest creditor, Oxbow Steel International, LLC ("Oxbow") designed to
2  create a partnership whereby TRAKLOC PACIFIC could resume the steel framing business to
3  produce both the Trakloc studs and conventional studs. Said negotiations have also, of necessity
4  involved negotiations with the equipment owners of the two lines of equipment leased by Trakloc
5  for the purpose of entering into new arrangements or resumption of the old arrangements for leasing
6  or use of the equipment. Defendants JABLOW and DERSOVITZ have engaged in repeated efforts
7  to interfere and disrupt that relationship by contacting Oxbow and attempting to dissuade it from
8  doing business with TRAKLOC PACIFIC and by contacting the two equipment lessors and making
9  offers to purchase the equipment lines, despite having no use for those lines themselves. Said offers
10  to the equipment lessors were made with knowledge of the Oxbow negotiations and not for a
11  legitimate business purpose, but with the express intent to make it impossible for Plaintiff to get back
12  into business and manufacture and sell the Trakloc product and conventional steel framing products.
13  Said acts have resulted in TRAKLOC PACIFIC being unable to complete an agreement with Oxbow,
14  thus further consummating the conspiracy of JABLOW and DERSOVITZ to put TRAKLOC
15  PACIFIC out of business and make sure it stayed out of business.

16      87.    TRAKLOC PACIFIC was the sole supplier of the Trakloc steel framing product in a
17  twelve state area in the western United States. TRAKLOC PACIFIC competed with conventional
18  steel framing products but had a competitive advantage over t hose products because its product could
19  be installed by framers in a much shorter time. Defendants acts have acted to restrain trade by making
20  the Trakloc system unavailable in the western United States. Such acts in restraint of trade and the
21  resulting restraint of trade was unreasonable in that Defendants had no rights of their own to market
22  and sell the Trakloc products in TRAKLOC PACIFIC's territories and their acts of interference were
23  conducted solely to put TRAKLOC PACIFIC out of business and impede its ability to maintain this
24  lawsuit.

25      88.    By reason of said wrongful acts, TRAKLOC PACIFIC has been damaged in amounts
26  which have not been fully ascertained. TRAKLOC PACIFIC is informed and believes that the amount
27  of damages by reason of the wrongful acts of DERSOVITZ and JABLOW exceeds $20,000,000.
28  TRAKLOC PACIFIC will offer proof of the amount of such damages at the time of trial herein.

------------------------------
Fourth Amended Complaint for Breach of Contract, etc.     -23-                    07CV1897

1       89.     By reason of the willful and malicious nature of the acts of JABLOW and

2  DERSOVITZ described herein, TRAKLOC PACIFIC is entitled to exemplary damages against said

3  Defendants in an amount to be determined by the trier of fact. TRAKLOC PACIFIC believes that said

4  sum should be in excess of $50,000,000.

5       Plaintiffs demand a jury trial in this matter.

6       WHEREFORE, Plaintiffs pray for damages against Defendants as follows:

7       1.     Pursuant to the First Cause of Action for judgment in favor of TRAKLOC PACIFIC

8  against TIN PLATE and TLNA, jointly and severally, in a sum in accordance with proof;

9       2.     Pursuant to the Second Cause of Action, for judgment in favor of TRAKLOC

10  PACIFIC against TIN PLATE and TLNA in an amount in accordance with proof, together with

11  exemplary damages in an amount to be determined by the trier of fact;

12       3.     Pursuant to the Third Cause of Action, for judgment in favor of TRAKLOC PACIFIC

13  against TLNA in accordance with proof;

14       4.     Pursuant to the Fourth Cause of Action for judgment in favor of TRAKLOC PACIFIC

15  against TLNA, JABLOW, SEM, and HORST in accordance with proof, together with exemplary

16  damages in an amount to be determined by the trier of fact;

17       5.     Pursuant to the Fifth Cause of Action, for judgment in favor of TRAKLOC PACIFIC

18  against TLNA , JABLOW , SEM, and HORST in an amount in accordance with proof, together with

19  exemplary damages in an amount to be determined by the trier of fact;

20       6.     Pursuant to the Sixth Cause of Action for judgment in favor of TRAKLOC PACIFIC

21  against TLNA, JABLOW , SEM, and HORST in an amount in accordance with proof, and that said

22  amount be trebled according to law;

23       7.     Pursuant to the Seventh Cause of Action, for a declaration setting forth the rights and

24  duties of TRAKLOC PACIFIC and TLNA and TIN PLATE to each other pursuant to the two License

25  Agreements between them:

26       8.     Pursuant to the First, Third and Sixth Causes of Action, for reasonable attorneys fees

27  in accordance with proof;

28       9.     Pursuant to the Eighth Cause of Action, for judgment in favor of all Plaintiffs against

1  Defendants DERSOVITZ, BERNSTEIN, PART 47, JABLOW and TLNA in accordance with proof,

2  together with exemplary damages in an amount to be determined by the trier of fact;

3       10.    Pursuant to the Ninth Cause of Action, for judgment in favor of TRAKLOC PACIFIC

4  against PART 47, BERNSTEIN and DERSOVITZ in accordance with proof, and for judgment in

5  favor of BEASLEY and KINNEY in accordance with proof;

6       11.    Pursuant to the Tenth Cause of Action, for judgment in favor of TRAKLOC PACIFIC

7  against DERSOVITZ and FLOATING ASSETS in an amount in accordance with proof;

8       12.    Pursuant to the Eleventh Cause of Action, for judgment in favor of TRAKLOC

9  PACIFIC again DERSOVITZ in the amount of $100,000.00, plus interest and exemplary damages

10  according to proof;

11       13.    Pursuant to the Twelfth Cause of Action, for judgment in favor of TRAKLOC

12  PACIFIC against DERSOVITZ and JABLOW in an amount in accordance with proof, together with

13  exemplary damages in an amount to be determined by the trier of fact; and

14       12.    For such other and further relief as to the Court deems proper and for costs of suit

15  incurred herein.

16  Dated: July 1, 2010               PHILLIPS, HASKETT & INGWALSON, a P. C.

17

18                         By:        s/Frederick C. Phillips
                             Frederick C. Phillips, Attorneys for

19                               TRAKLOC PACIFIC

20

21

22

23

24

25  Phillips\Trakloc\ThirdAmendedComplaint

26

27

28

# TRAKLOC PRE-INCORPORATION AGREEMENT

THIS TRAKLOC PRE-INCORPORATION AGREEMENT ("Agreement") is entered into as of September 11, 2007, by and among Wiltin Pty Ltd. ("Wiltin"), William J. Andrews ("Andrews"), Marc A. Bernstein ("Bernstein"), On The Right Track, LLC ("OTRT"), Geoffrey Darmody ("Darmody"), Michael Albano ("Albano") and Roni Dersovitz ("Dersovitz"), each on behalf of itself and its owners, principals, members, shareholders, related companies, successors and assigns, collectively referred to as "the parties".

## R-E-C-I-T-A-L-S

A.    Andrews is the owner of Wiltin and through Wiltin owns and controls all the existing patents and patents pending, for the Trakloc technology. Wiltin also owns all global international rights to the Trakloc technology. All such technology owned and controlled by Wiltin and by Andrews is referred to herein as the "Intellectual Property".

B.    Wiltin entered into a license agreement with International Fabricated Buildings, Inc. ("IF"), with an effective date of January 30, 2002 which agreement was assigned to Trakloc International, LLC ("TI") (the "TI License Agreement") and entered into an Intellectual Property and Working Agreement with IF, which agreement was assigned to TI, with an effective date of January 30, 2002 (the "TI IP Agreement"). Under these two agreements (collectively, the "TI License Agreements"), Wiltin licensed IF (assigned to TI) the right to manufacture, distribute and market the Trakloc technology in the United States, Canada, Mexico and Brazil. Under the terms of a settlement agreement (the "Settlement Agreement") by and between TI and Pandora Select Partners, L.P. ("Pandora") dated July 20, 2006, Wiltin was required to enter into a Contingent License and Working Agreement with TI and Pandora dated July 15, 2006 (the "Pandora License"). Pursuant to the Settlement Agreement and subsequent alleged foreclosure, the assets of TI, including the TI License Agreements, were allegedly transferred to Pandora.

C.    Bernstein and Albano and OTRT and their respective shareholders, are one of the master licensees of TI, and they desire to enter into this Agreement to create a new entity with Wiltin, Andrews, Darmody and Dersovitz to operate their licensed territories; market and manufacture the Trakloc product on a global basis and litigate with Pandora and/or Jablow to claim the rightful title to the licenses previously held by TI. Bernstein has arranged sufficient investment capital to accomplish the purposes described herein and is responsible for the prosecution of the litigation to re-secure the rights previously held by Trakloc International.

D.    The parties to this Agreement desire to memorialize their agreements and to move forward together to organize the new Trakloc entity ("New Trakloc").

1

BERNSTEIN BERNSTEIN          09/15/2007 10:52 FAX 2128080554          ☒ 002/013

TLP INV_DERSOVITZ_000004

EXHIBIT____ PAGE____

NOW, THEREFORE, FOR VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH IS HEREBY ACKNOWLEDGED, THE PARTIES AGREE AS FOLLOWS:

### 1.   New Trakloc

The parties agree to take all steps necessary and appropriate to establish and organize New Trakloc as soon as possible under the terms and conditions enumerated herein. Until the new entity is incorporated, the parties agree to be governed by a Pre-Incorporation Board of Directors to be comprised of Andrews, Bernstein, Albano, Darmody, Dersovitz and two individuals to be named by Andrews (the "Andrews Directors"). Andrews, Bernstein, Albano, Darmody, Dersovitz and the two Andrews Directors shall serve as directors of New Trakloc and all affiliate entities of New Trakloc in perpetuity. However, should an accepted investor require seats on the Board, additional board seats may be created by a majority vote of said board; provided sufficient additional board seats are added so that Andrews and his directors hold a majority of the seats on the board so long as any of the IP Consideration remains unpaid. All directorships are irrevocable and until the Andrews Directors have been appointed, Andrews shall maintain their voting rights. Directors shall receive monthly salaries to be paid by New Trakloc in such amounts and at such times as the Board of New Trakloc shall determine. Upon the organization of New Trakloc, the Pre-Incorporation Board of Directors shall become the Board of Directors of New Trakloc . The officers of New Trakloc shall be determined and appointed by the Board of Directors.

During the life of New Trakloc the Board shall include 1. Andrews; 2. Bernstein; 3. Albano; 4. Darmody; 5 Dersovitz ; 6 and 7 the Andrews directors. All the directors shall serve in perpetuity. Upon the death or inability to serve of Bernstein, Albano or Dersovitz, the remaining of them shall appoint a successor for the director who is no longer able to serve. Upon the death or inability to serve of Andrews, Darmody or the Andrews Directors, or any other directors appointed by Andrews, then Andrews if he then remains a director, or if not, then the remaining of them, shall appoint a successor for the director who is no longer able to serve. The officers of New Trakloc shall be appointed by the Board of Directors, from time to time, in its discretion. The number of Directors shall not be increased or decreased without the prior written consent of Andrews, so long as monies for the purchase of the Intellectual Property are owed by New Trakloc to Andrews.

Upon the execution of this Agreement by all parties, Bernstein shall organize "New Trakloc" as a Delaware corporation, and all of the rights and obligations agreed to herein shall be transferred to and shall bind the new company, upon the occurrence of certain triggering events described herein. Once the triggering events have occurred, the company hereby ratifies this Agreement.

### 2.   Ownership and Management

2

TLP INV_DERSOVITZ_000005

EXHIBIT ___1___ PAGE 2

The initial ownership of New Trakioc shall be allocated 40 Shares to Wiltin, 40 shares to Bernstein and Albano and OTRT, in the aggregate, and 20 shares to Dersovitz; provided, however, that this Agreement shall constitute a Voting Agreement whereby Bernstein and Albano and OTRT hereby grant to Wiltin an irrevocable proxy to vote 11 of their shares for a period ending two (2) years after the date at least $3 million, less applicable closing costs, is invested in, or loaned to New Trakioc as provided under Section 3 hereof. Said proxy shall be deemed to be coupled with an interest and shall convey all voting rights with respect to such 11 shares to Wiltin or his successor, but all other rights to ownership, distributions and dividends shall remain with Bernstein and Albano and OTRT. A percentage of the profits of New Trakioc, to be determined by the Board, shall initially be used to retire existing debt of New Trakioc's members and related entities that the Board determines is required to be paid in the interest of the integrity of the new company. After retiring said debt, said income shall remain in the company, unless and until a vote for distribution is made by the board. Additional shares shall be allocated by the Board, in its discretion.

Shares may only be transferred (a) if the transfer is approved by the Board, or (b) to any transferee under the following terms and conditions:

A. A current shareholder must receive a written offer to acquire the shareholder's shares, in whole or in part;

B. The shareholder receiving said offer shall present same to the board within five (5) days of receipt;

C. The company shall then have ninety (90) days to purchase the shares in question under the same terms and conditions;

D. Should the company fail to exercise the option during the period of time described above, the individual board members, who voted to match the offer, shall have thirty (30) days to purchase the shares in question on a pro rata basis.

The Board of Directors shall determine if and when any additional shares shall be issued thereafter and in what amounts, with each existing shareholder, other than Andrews, sharing equally in any dilution. Andrews's shares shall not be diluted below 20% of the outstanding shares of the company unless agreed upon by a unanimous vote of the board, including Andrews. *~~Andrews shares shall not be diluted below~~* *below* *~~15% of the outstanding shares of the company unless Agreed upon by~~* *of the company unless Agreed upon by* *~~A UNANIMOUS vote to be the board, including Dersovitz~~* $MB$

Unless changed by the Board of Directors, the elected company officers shall manage New Trakioc and shall negotiate with third parties concerning any business of New Trakioc and shall sign all contracts which have been approved by the Board.

Every two weeks, as of the 15th day and the last day of each month, the elected company officers shall provide a written management and financial report for the prior 2-week period, in a form acceptable to the Board. These reports shall be due

3

TLP INV_DERSOVITZ_000006

EXHIBIT____1____ PAGE 3

monthly, rather than semi-monthly, after one year. The Board shall meet at least monthly, at such time and dates as shall be determined by the Board, with attendance by telephone conference call permitted.

3. **Required Financing or Investment to be Arranged by Bernstein; Litigation**

3.1   Funds shall be required by New Trakloc to operate the licensed territories; market Trakloc on a global basis; and litigate with Pandora and/or Jablow to reclaim rightful title to the licenses previously held by TI. In exchange for the issuing of 20 shares of the company stock to Dersovitz he agrees to invest the sum of $3 million. Of this amount, $500,000 shall be paid within thirty (30) days of the execution of this agreement and $2.5 million ($2,500,000) shall be paid within sixty (60) days of the execution hereof, Bernstein and Albano have arranged for this initial funding required by New Trakloc. They will continue to attempt to arrange the contemplated additional investment of $7 million. The terms of any future financing or any additional investment in the company shall be approved by the Board. Any future financing shall have a term of at least 1 year.

*on or before November first 2007* *MB* *AB*

3.2   Should Dersovitz fail to make either of the two (2) investment payments in the time prescribed, he will be given five (5) days written notice to cure. If his default is not cured in that time frame he shall forfeit his entire interest in the company and his shares shall revert to the remaining shareholders on a 50-50 basis. No amount of funds paid by Dersovitz to the company prior to such default shall be returned to him.

3.3   In the event of a default by Dersovitz, Bernstein and Albano shall then be given three (3) weeks to obtain the balance of the $3 million, less applicable closing costs. If they fail to arrange the described financing within such time period, then Andrews shall be entitled, in his discretion, to terminate this Agreement by giving written notice of such termination to the parties at any time after the three weeks and before such described financing is arranged and funded. The company, Bernstein, Albano, OTRT and Dersovitz, to the extent their guaranty or pledge of any assets of is required for any financing obtained by New Trakloc, and to the extent they continue to exist, shall guarantee the loan. If said financing is required for New Trakloc it must be on terms and conditions approved by the Board.

3.4   It is agreed that the New Trakloc shall be wholly responsible for repayment of the loan taken to fund this company and Bernstein and Albano agree to allow the loan to remain open, even after receipt of investment capital, if the Board determines, based upon a comprehensive capital plan that it is necessary to employ those funds, pursuant to that plan, for the financial well-being of the company.

3.5   Subject to final approval by Andrews, Bernstein shall commence prior to October 15, 2007 a lawsuit in Wiltin's name which shall seek, inter alia, to claim rightful title to the licenses previously held by TI and to thereby void Pandora's and

4

TLP INV_DERSOVITZ_000007

EXHIBIT ___ PAGE 4

and Jablow's position, if any. If successful, all rights obtained and any damages derived from said suit will become rights of New Trakloc, including the acquisition of the rights previously held by TI. The first monies recovered by New Trakloc from such lawsuit shall be distributed, when and in such amounts as shall be determined by the Board, pursuant to Section 7.2 below, until the amount to be distributed pursuant to Section 7.2 have been fully distributed.

### 4.   Transfer of Assets and Liabilities of OTRT

Upon incorporation of New Trakloc, all the assets of OTRT and their liabilities, to the extent approved by the Board, shall be transferred to and assumed by New Trakloc in consideration of the shares of New Trakloc to be issued to the OTRT, Bernstein and Albano group.   This shall be done in accordance with all licensing requirements.

### 5.   Transfer of Intellectual Property

5.1   Subject to the terms and conditions of this Agreement, Wiltin and Andrews agree, on the date New Trakloc receives funding from investment or financing of at least $3 million, less applicable closing costs and provided they receive $145,000 in cleared funds as provided below, they shall transfer all of their rights, title and interest in the Intellectual Property, including all existing patents and patents pending, and all trade names and trademarks, and all international rights except for Australia and New Zealand, and all rights, if any, under the TI License Agreements, to New Trakloc, for the sum total of $5 million (the "IP Consideration).

5.2   The payment terms for the IP Consideration shall be $145,000 within three (3) days of the funding of this Agreement (of which $50,000 has already been paid), an additional $125,000 shall be due on the date which is 6 months after the date of this Agreement, an additional $250,000 shall be due on the date which is 12 months after the date of this Agreement, and a minimum of $1,000,000 shall be due every 12 months thereafter until paid in full. Any payments which are in excess of the stated payment amounts shall be determined by the Board. The form of the transfer documents shall be prepared by counsel selected by the Board, and approved by Wiltin, Andrews and the Board. None of the payments of the IP Consideration, once paid, shall be refundable for any reason.

5.3   In addition to paying the IP Consideration, New Trakloc shall pay all filing fees and costs, all attorneys' fees and all other costs and expenses, and shall take all steps necessary or appropriate, to protect, preserve and maintain the Intellectual Property, under the direction and supervision of Andrews and Darmody or a Board committee chaired by one of them.

5.4   In agreeing to enter into this Agreement, it is critical to Wiltin and Andrews that the Intellectual Property be properly protected and not subject to any assignment, sale, hypothecation or encumbrance while any amount of the IP

5

TLP INV_DERSOVITZ_000008

EXHIBIT ___1___ PAGE 5

Consideration remains unpaid.  For that reason, so long as any part of the IP Consideration remains unpaid, New Trakloc shall not be entitled to assign, sell, hypothecate or encumber in any way any of the Intellectual Property without the prior written consent of Andrews, which may be withheld for any reason in his sole and absolute discretion.  As further protection of the Intellectual Property, the parties agree that Andrews, if he determines it is in the company's best interests to do so (in his absolute discretion), may transfer the Intellectual Property to a separate new corporate entity to be formed concurrently with the formation of New Trakloc (the "IP Company"), which IP Company shall have the same Board of Directors and officers, and same ownership, as New Trakloc, but which shall be established and maintained as a separate company for the sole purpose of holding and exploiting the Intellectual Property.

5.5    Andrews shall consult with counsel and determine whether to elect to form a separate IP Company and advise the parties of this decision on or before September 21, 2007, subject to funding.  Should the IP Company be established, the IP Company must enter into an exclusive license agreement with New Trakloc to provide New Trakloc with the exclusive right to use the Intellectual Property as structured herein.

5.6    Should New Trakloc or the IP Company, at any time when any part of the IP Consideration remains unpaid, (a) fail to make when due any payment of the IP Consideration, (b) fail to make when due any consulting payments due to Andrews and Darmody under Section 6 below, (c) attempt to assign, sell, hypothecate or encumber in any way the Intellectual Property without the prior written consent of Andrews, (a) through (c) shall each constitute a material default hereunder.  Upon any material default, Andrews shall provide written notice thereof to the company describing the default and providing ninety (90) calendar days to cure such default.  Any monetary default may be cured 3 times.  After any 3 monetary defaults, there shall be no cure period.  If the company fails to cure any material default as provided herein, upon written notice from Andrews to the company, the company shall immediately transfer the Intellectual Property back to him, without further notice or action or consideration.

## 6.    Compensation to Andrews and Darmody

On the first of the first month following the incorporation of New Trakloc, but in no event later than October 1, 2007, Andrews and Darmody shall each be paid a $5,000 monthly consulting fee by New Trakloc. Such payments shall continue monthly on the first day of each month, continuing in perpetuity, without offset or deduction. This payment shall be in addition to and independent of, any director's fees, salaries or other compensation or distributions which may be made to Andrews and/or Darmody. This $5,000.00 dollars per month shall be in addition to and independent of the IP Consideration.

Andrews shall receive the $95,000 still due him for IP Consideration, by wire transfer, within three (3) days of deposit of the $3 million, less applicable closing costs. Said funds to be paid out of the funds of New Trakloc.

6

TLP INV_DERSOVITZ_000009

EXHIBIT 1 PAGE 6

### 7. Assumption of Debt by New Trakloc; Distributions

7.1     Upon the incorporation of New Trakloc and as assets and cash flow will allow, as determined by the Board, New Trakloc shall begin to pay the obligations which it assumes, in such amounts and as such times as shall be determined by the Board, giving priority to making those payments which will protect the credit standing of the parties and best preserve the goodwill and name of Trakloc. Only such debt incurred by the members of New Trakloc shall be guaranteed to be repaid by the company.

7.2     However, the first monies available from profits, or from the lawsuit described in Section 3.5 above, shall be distributed from time to time as determined by the Board, pro rata and on a concurrent basis, to Andrews on the one hand, and Bernstein and Albano on the other hand, until Andrews has received aggregate distributions of $2.2 million and Bernstein and Albano have received distributions of $2.2 million, in the aggregate, subject to such $2.2 million amount being increased, but not decreased, by the board. These distributions shall be made by the board in a commercially reasonable fashion.

7.3     All funds previously or subsequently advanced by Bernstein and Albano to Wiltin, Andrews and Darmody shall be considered to have been done on behalf of "New Trakloc" and shall be the first funds repaid by "New Trakloc" and pursuant to this Agreement shall be repaid at the time of the receipt of first funds by New Trakloc out of the $3 million of investment or loan proceeds, less costs.

### 8. Non-Circumvention and Confidentiality

Each party, intending to be legally bound, hereby irrevocably agrees that he or it shall not, directly or indirectly interfere with, circumvent or attempt to circumvent, avoid, bypass, or obviate the interests of any other party under this Agreement, including but not limited to, attempting to deal with, or negotiate with Pandora or any other third party, or with any lender or investor, to the detriment of New Trakloc or any of the parties hereto.

The Board shall authorize company officers to negotiate on behalf of "New Trakloc" with Pandora and/or Jablow for the purposes of acquiring the former "TI" assets, but shall receive board approval before consummating any deal.

### 9. Independent Contractors

The parties agree that (a) this Agreement does not constitute a hiring or employment agreement by any party, (b) each party hereto is an independent contracting party with respect to all services rendered under this Agreement or in any resulting transactions, and (c) nothing contained herein shall be deemed to constitute or create any partnership, joint venture or other profit sharing arrangement or association, other than the commitment of the parties to establish New Trakloc as provided in this Agreement.

7

☑008/013                        BERNSTEIN BERNSTEIN                        21280B0044  FAX  10:55  09/18/2007

TLP INV_DERSOVITZ_000010

EXHIBIT ___ PAGE 7

## 10.   Attorney's Fees

If any legal action or other proceeding is brought to enforce the terms of this Agreement, including any arbitration proceedings, the successful or prevailing party shall be entitled to recover all reasonable fees and costs incurred in such action or proceeding, including but not limited to attorney's fees, in addition to any other relief to which it may be entitled.

Additionally, New Trakloc shall be responsible for any and all legal fees incurred in prosecuting the case against Pandora and Jablow, as approved by the Board. Any and all documented legal fees advanced by Bernstein and Albano to prepare such case prior to the signing of this agreement, to the extent incurred pursuant to a written retainer agreement and to the extent approved by Andrews up to an aggregate of $25,000.00 prior to the company paying for same, shall also be reimbursed at the time of first funding, either by loan or investment.

## 11.   Time is of the Essence

The parties agree that time shall be of the essence of this Agreement and each and every provision hereof.

## 12.   Notices

All notices and other communications required or permitted hereunder shall be in writing, shall be effective when given, and shall in any event be deemed to be given upon receipt by the other party or, if earlier, (a) five (5) days after deposit with the United States Postal Services or other applicable postal service, if delivered by first class mail, postage prepaid, (b) upon delivery, if delivered by hand, (c) one (1) business day after the business day of deposit with Federal Express or similar overnight courier, freight prepaid or (d) one (1) business day after the business day of facsimile transmission, if delivered by facsimile transmission with copy by first class mail, postage prepaid, and shall be addressed to the parties at the following addressed and/or facsimile numbers for at such other address or number for a party as shall be specified by like notice):

        (a)    If to Bernstein, Albano or OTRT, to:

              Marc A. Bernstein, Esq.
              116 John Street, Suite 1300
              New York, New York 10038
              Facsimile: (212) 608-0054

        (b)    If to Andrews, Wiltin or Darmody, to:

              Mr. William J. Andrews

8

@008/013                    BERNSTEIN BERNSTEIN               2128080054  FAX  10:55  07/18/2007

EXHIBIT   1   PAGE   8

Wiltin Pty Ltd.
Emery Road, Cambewarra
N.S.W. 2541 Australia

(c)     If to Dersovitz to:

Mr. Roni Dersovitz
C/o RD Legal Funding
1 Engle Street
Englewood, NJ
Facsimile: (201) 568-9307

### 13.   Assignments

Except as provided in Section 2, no party hereto may assign any of his rights or obligations hereunder without the prior written consent of the other parties hereto. This Agreement will be binding upon and insure to the benefit of the parties hereto and their respective successors and permitted assigns.

### 14.   Severability

If any provision of this Agreement, or the application thereof, will for any reason and to any extent be invalid or unenforceable, the remainder of this Agreement and application of such provision to other persons or circumstances will be interpreted so as reasonable to affect the interest of the parties hereto. The parties further agree to replace such void or unenforceable provisions of this Agreement with a valid and enforceable provision that will achieve, to the greatest extent possible, the economic, business and other purpose of the void unenforceable provision.

### 15.   Construction of Agreement; Representation by Legal Counsel

This Agreement shall be deemed to have been jointly drafted by all the parties hereto and shall not be construed for or against any party hereto. A reference to a Section or an Exhibit will mean a Section in. or Exhibit to, this Agreement unless otherwise explicitly set forth. The titles and headings herein are for reference purposes only and will not in any manner limit the construction of this Agreement which will be considered as a whole. Each party hereby represents for the benefit of each other party hereto that such party has been advised that it should be represented by independent counsel in connection with this Agreement. and each party further represents that such party has either been represented by independent legal counsel or elected in his sole discretion not to seek advise from independent legal counsel.

### 16.   Further Assurances

9

TLP INV_DERSOVITZ_000012

EXHIBIT ___ PAGE 9

Each party agrees to cooperate fully with the other parties and to execute such further instruments, documents and agreements and to give such further written assurances as may be reasonably requested by any other party to evidence and reflect the transactions described herein and contemplated hereby and to carry into effect the intents and purposes of this Agreement.

The Board will adopt the policies which will require all matters relating to the development of the Trakloc products and/or equipment used to manufacture those products to be approved by Andrews and Darmody, or a Board committee co-chaired by them.

### 17.    Entire Agreement

This Agreement constitutes the entire understanding and agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreement or understandings, inducements or conditions, express or implied, written or oral, between the parties respect hereto. The express terms hereof control and supersede any course of performance or usage of trade inconsistent with any of terms hereof.

### 18.    Counterpart Agreements

This Agreement may be execute in one or more counterparts, all of which shall considered one and the same agreement and shall become effective when one or more counterparts have been signed by each other of the parties and delivered to the other party.

### 19.    Amendment

This Agreement may not be amended except by an instrument in writing signed by all parties hereto.

### 20.    Specific Performance

Each party's obligation under the Agreement is unique. If any party should default in its obligations under the Agreement, the parties each acknowledge that in addition to any other available rights or remedies, they may sue the entity in equity for specific performance, and the parties each expressly waive the defense that monetary remedy may be adequate. The parties further agree that no bond or any other form of surety shall be required as a condition to the filing of any hereunder for specific performance.

### 21.    Authority

Each party hereby represents and warrants to the other parties that they have the right and lawful authority to enter into this Agreement for the purpose herein and there are no other outstanding agreements or obligations inconsistent with the terms

(0

TLP INV_DERSOVITZ_000013

EXHIBIT ___1___ PAGE __10__

and provisions hereof.

### 22.   Venue

It shall be assumed, for the purposes of this Agreement, that the terms herein were negotiated and agreed to in the states of New York and California. All parties hereto were represented by counsel and consent to Venue for any and all litigation arising out of the terms and conditions hereto shall be brought in either New York Federal Court or California Federal Court.

**The next page is the signature page.**

11

TLP INV_DERSOVITZ_000014

EXHIBIT ___1___ PAGE _11_

2007-09-13 13:04                           >>          2128080054                         P V1

IN WITNESS WHEREOF, the parties hereto have caused their representatives to affix the appropriate signatures hereto and agree to be bound thereby, to be effective as of the date first written above.

Dated: September 11, 2007

OTRT:                          On the Right Track LLC

                               By:
                               Marc A. Bernstein
                               Managing Member

Bernstein:
                               Marc A. Bernstein

Albano:
                               Michael Albano

Wikin:                         Wikin PTY LTD,

                               By:
                               William J. Andrews
                               Secretary

Andrews:
                               William J. Andrews

Darmody:
                               Thomas P. Darmody

Dersovize:
                               Roni Dersovitz

12

2007-09-13 13:01                           2128080054

09/13/2007 10:51 FAX  2128080054      BERNSTEIN BERNSTEIN              013/013

EXHIBIT ___1___ PAGE ___12___

# AGREEMENT TO PURCHASE

This Agreement, is entered into on the 26th day of October, 2007, by Part 47, Inc. ("P47") and Pacific Rollforming, LLC ("PR"), (collectively, the "Parties").

Whereas, "P47" has acquired the interests of Wiltin PTY LTD, and therefore owns and controls all of the existing patents and patents pending for the Trakloc technology and all global rights for the Trakloc technology;

Whereas, "P47", has been formed to market the Trakloc technology on a global basis and pursuant to said formation funds are required to be deposited sufficient to, among other things, perform the obligations of this agreement;

WHEREAS, the "Parties" hereto wish to enter into an agreement, where "P47" purchases from "PR" a membership interest in the business of "PR" equal to 36.67% of the overall business interest in the company "PR";

WHEREAS, it is acknowledged between the parties that as of June 30, 2007, 29.72% of "PR" is owned by a third-party known as TRAKLOC MIDWEST, LLC (hereinafter "TM");

WHEREAS, it is acknowledged between the parties that subject to and in accordance with the terms, covenants and conditions of this agreement "P47" shall hereby acquire 36.67% of "PR" membership interest as well as certain other rights in accordance with the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the "Parties" hereto agree as follows:

1. **ACQUISITION**



EXHIBIT 2 PAGE 1

a)    "P47" shall acquire from "PR" a 36.67% interest in said company, under the terms and conditions enumerated herein. Upon completion of the acquisition, the ownership of the membership interest in "PR" shall be as follows:

| | |
|---|---|
| Beasley/Kinney/AMP | 44.51% |
| "P47" | 36.67% |
| "TM" | 18.82% |

The total percentage between the three members shall total 100%.

b) "P47" shall have the exclusive right, but not obligation (as it relates to "PR", Beasley, Kinney and AMP) to negotiate for the purchase of the membership interest of "TM" in "PR" for a period of one year after the signing of this Agreement. Thereafter, "P47" shall have the first right-of-refusal to match any legitimate offers to purchase that membership interest. The acquisition by "P47" of all or a portion of the interest maintained by "TM" in "PR" shall in no way effect the day to day business operations of "PR" nor shall Beasley/Kinney/AMP have any interest in the share acquired by "P47" from "TM". If "P47" is successful in this acquisition during the exclusivity period, Beasley/Kinney/AMP shall dilute their combined membership interest to 33.33%. Any acquisition of the membership interest of "TM" by "P47" shall include the resolution of the "TM" lawsuit against "PR" and the cancellation of the "TM" sub-license with "PR".

c) "P47" may take whatever legal steps necessary to accomplish the acquisition of "TM" and Beasley/Kinney/AMP will take no action that could in anyway be construed to be adverse to the position taken by "P47" during the time of the negotiation of "P47's" acquisition of "TM".

d) "P47" hereby agrees that in the event the license of Trakloc North America, LLC ("TLNA") is terminated for any reason, "PR" shall become a direct licensee of "P47" under reasonable terms and conditions to be negotiated between the parties.

2.                                    **PAYMENTS**

"P47" shall make the following payments to and on behalf of "PR":

a)    Within three (3) business days of receipt of a fully executed original of this agreement, "P47" will cause to have transferred into the account of "PR" the sum of $100,000.00;



EXHIBIT 2 PAGE 2

b)     Thereafter, "P47" shall provide to "PR" on an ongoing basis necessary funds in order to meet their continuing obligations on a going forward basis, including, inter alia:

i) rent
ii) steel costs
iii) payroll
iv) equipment payments
v) utilities
vi)) shipping
vii) other essential payments (including necessary litigation costs)

c)     "P47" shall have the absolute right upon payment of the initial $100,000.00 to contact any and all of the creditors of "PR" to work out credit terms more favorable to those currently enjoyed by "PR" and shall be entitled to make arrangements for alternative providers subject to the mutual agreement of the Parties; "P47" shall be obligated to contribute to "PR" the sums necessary to make payments to creditors of "PR" on the basis of those negotiated terms or as otherwise necessary. The first $3,000,000 contributed by "P47" shall be considered an equity investment. All additional deposits or payments in addition to the first $3,000,000 shall be considered loans in accordance with the provisions of this paragraph. All such loans shall bear an interest rate of 10% per annum and be re-paid out of profits of "PR".

d)     All receivables, payables and orders shall be transferred to Dersovitz and he will insure that all information received is immediately and easily accessible on line to all members of the company. All accounting shall be done out of the New Jersey office.

e)     "PR" shall take all necessary steps to direct all future bills, payments and billing to Dersovitz at a lock box address to be provided upon payment of the $100,000.00.

f)     There is presently litigation ongoing between "PR" and Trakloc North America, LLC (hereinafter "TLNA"). "P47" agrees to pay to "PR" the sum of $1,000,000.00 over an eighteen month period, without interest once the litigation between "TLNA" and "PR" has been completed and so long as "PR" remains the licensee of it's current territories at the conclusion of the litigation. Said payments shall be for the express purpose of retiring loans to "PR" made by Beasley or entities controlled by Beasley. If "PR" remains the licensee for the 10 western states, but not for the states of Illinois and Wisconsin at the conclusion of the litigation, or if "PR" decides to abandon



EXHIBIT 2  PAGE 3

those two states at any time up to the conclusion of the litigation, this sum shall be reduced to $800,000.

g)    Roni Dersovitz and Todd Beasley shall act as co-managers of "PR", with Roni Dersovitz being in charge of financial matters and Todd Beasley being in charge of operational matters. The managers shall consult with each other on no less than a bi-weekly basis. All operational matters outside the normal scope of business shall require the approval of both "PR" and "P47".

h)    Todd Beasley represents and warrants the cost "pro forma" information attached to this Agreement as Exhibit "A" is true and accurate to the best of his belief and knowledge. Should any of that information prove to be materially inaccurate, any additional losses occasioned as a result of that inaccuracy shall be deducted from the payments to be made to "PR" at the conclusion of the suit with "TLNA."

i) "PR" shall attach to this agreement all current debts, of any nature and from any source as of the date of this Agreement. "P47" shall bear no responsibility for any debt not enumerated by "PR" and hereby incorporated into this agreement. The Parties hereto acknowledge that liabilities occur literally every day during the normal course of the ongoing business of "PR", and that invoices related to these liabilities may not all be included but will nonetheless be recognized as legitimate debts of the Parties.

3.                    **ADDITIONAL TERMS**

a)    This is the only written agreement between these parties as of the date of this agreement. Any and all prior conversations, writings or proposals are of no force and effect.

b)    This agreement cannot be changed orally and a written and fully executed copy of any changes must be executed in order to be valid.

c)    If any clauses or portions of this agreement are found to be invalid as a matter of law, the remainder shall remain in full force and effect.

d)    This agreement shall be construed to have been executed and negotiated in the State of New Jersey and all Parties hereto agree to jurisdiction in the Federal Courts therein.

e)    "P47" shall take responsibility, with the consent of "PR" as to timing, to forward all necessary notifications of any additional parties, including TLNA.

f)    This Agreement is subject to any requirement of the "PR" Operating Agreement that "TM" approve this purchase by waiving or not exercising it's right of first refusal in accordance with Section 3.6 of the "PR" Operating Agreement. In




EXHIBIT 2 PAGE 4

the event that "TM" elects to exercises it's right of first refusal within the requisite time period, "PR" shall be responsible to return all sums advanced to "PR" by "P47" within thirty days.

g)    Any and all other terms of this agreement shall be considered to be "member" issues and shall be worked out pursuant to a new membership agreement for "PR".

h)    "P47" agrees to take the necessary steps to remove Beasley, Kinney, AMP and the individual owners of "TM" from any personal guarantees or other direct obligations for debts of "PR" at the earliest possible date, using sound and appropriate business judgment.

i)    A Board of Directors for "PR" shall be established, with each party, "P47" and "PR" appointing three members. Said Board shall be responsible for the operations of "PR".

j)    If the entity owning the Trakloc technology patents and intellectual property rights described above becomes any entity other than "P47", "P47" and Marc Bernstein shall cause that successor entity to become a signatory to this Agreement.

k) Beasley, Kinney, and AMP hereby pledge their shares in "PR" as security for all monies advanced by "P47" during the pendancy of the litigation between "PR" and TLNA". Should "PR" lose said litigation then the shares of "PR" shall be held by "P47", until said advanced funds have been returned.

Part 47, Inc.

By: MARC P BERNSTEIN

Pacific Rollforming, LLC

By: TODD BEASLEY

EXHIBIT 2 PAGE 5

# Exhibit A Raw Material Cost Estimate

Page 1 of 4

| | Coil Strip Width | GAUGE | IN/FT | DENSITY | | FT/TON | $/FT |
|---|---|---|---|---|---|---|---|
| LBS PER TON | 2000 | | | | | | |
| $ PER TON | 790 | | | | | | |
| **2-1/2" Products** | | | | | | | |
| 250 TTS 137-18 | 5.48 | 0.018 | 12 | 0.2833 | 0.3353 | 5964.16 | 0.1325 |
| 250 TSO 125-18 | 5.41 | 0.018 | 12 | 0.2833 | 0.3311 | 6041.33 | 0.1308 |
| 250 TSE 125-18 | 5.23 | 0.018 | 12 | 0.2833 | 0.3200 | 6249.25 | 0.1264 |
| 250 TTS 137-30 | 5.48 | 0.030 | 12 | 0.2833 | 0.5589 | 3578.49 | 0.2208 |
| 250 TSO 125-30 | 5.38 | 0.030 | 12 | 0.2833 | 0.5467 | 3658.61 | 0.21159 |
| 250 TSE 125-30 | 5.15 | 0.030 | 12 | 0.2833 | 0.5252 | 3807.80 | 0.2076 |
| **3-5/8" Products** | | | | | | | |
| 362 TTS 137-18 | 6.61 | 0.018 | 12 | 0.2833 | 0.4045 | 4944.57 | 0.1598 |
| 382 TSO 125-18 | 6.54 | 0.018 | 12 | 0.2833 | 0.4002 | 4997.49 | 0.1581 |
| 382 TSE 125-18 | 6.36 | 0.018 | 12 | 0.2833 | 0.3892 | 5136.93 | 0.1537 |
| 362 TTS 137-30 | 6.61 | 0.030 | 12 | 0.2833 | 0.6741 | 2966.74 | 0.2663 |
| 362 TSO 125-30 | 6.49 | 0.030 | 12 | 0.2833 | 0.6619 | 3021.59 | 0.2615 |
| 362 TSE 125-30 | 6.28 | 0.030 | 12 | 0.2833 | 0.6405 | 3122.64 | 0.2530 |
| **6" Products** | | | | | | | |
| 600 TTS 137-30 | 8.88 | 0.030 | 12 | 0.2833 | 0.9159 | 2183.76 | 0.3618 |
| 600 TSO 125-30 | 8.86 | 0.030 | 12 | 0.2833 | 0.9036 | 2213.34 | 0.3569 |
| 600 TSE 125-30 | 8.85 | 0.030 | 12 | 0.2833 | 0.8822 | 2267.07 | 0.3485 |

Note: the cost of steel is variable. The material we have been using for the first nine months of 2007 was approximately $839 per ton. Our most recent purchase was at $790 per ton. When we reconcile inventory at the end of a period we use "average actual" steel cost. Pro forma costs shown herein are based on $790 per ton.

Costs shown are estimated cost to produce the Trakloc products based on a factory running full time, with all required equipment installed and working properly, FOB Antioch, CA. Does not include freight or royalty.



EXHIBIT 2 PAGE 6

# Exhibit A Estimated Standard Processing Costs 2-1/2 Inch

Page 2 of 4

| | 250 TTS 137-18 | 250 TTS 137-30 | 250 TSO 125-18 | 250 TSO 125-30 | 250 TSE 125-18 | 250 TSE 125-30 |
|---|---|---|---|---|---|---|
| STEEL COST | 0.1325 | 0.2208 | 0.1308 | 0.2169 | 0.1264 | 0.2075 |
| | | | | | | |
| PROCESSING COST | | | | | | |
| | | | | | | |
| LABOR | 0.0035 | 0.0035 | 0.0104 | 0.0104 | 0.0358 | 0.0358 |
| SHOP RENT | 0.0050 | 0.0060 | 0.0050 | 0.0050 | 0.0050 | 0.0050 |
| ELECT | 0.0033 | 0.0033 | 0.0033 | 0.0033 | 0.0033 | 0.0033 |
| SUPPLIES | 0.0049 | 0.0049 | 0.0049 | 0.0049 | 0.0049 | 0.0049 |
| LUBRICANTS | 0.0008 | 0.0008 | 0.0008 | 0.0008 | 0.0008 | 0.0008 |
| FORKLIFT DEP | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 |
| FORKLIFT FUEL | 0.0002 | 0.0002 | 0.0002 | 0.0002 | 0.0002 | 0.0002 |
| BANDING | 0.0023 | 0.0023 | 0.0023 | 0.0023 | 0.0023 | 0.0023 |
| STRAPPER DEP | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 |
| TRUCK DEP | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 |
| TRUCK FUEL | 0.0002 | 0.0002 | 0.0002 | 0.0002 | 0.0002 | 0.0002 |
| COMP DEP | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| PLANT WIRING | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| MFG MACH DEP | 0.0005 | 0.0005 | 0.0008 | 0.0008 | 0.0008 | 0.0008 |
| MACH R&M | 0.0030 | 0.0030 | 0.0030 | 0.0030 | 0.0030 | 0.0030 |
| SLITTING | 0.0073 | 0.0073 | 0.0073 | 0.0073 | 0.0073 | 0.0073 |
| SMALL TOOLS | 0.0004 | 0.0004 | 0.0004 | 0.0004 | 0.0004 | 0.0004 |
| TRASH | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 |
| ACERO | 0.0010 | 0.0010 | 0.0010 | 0.0010 | 0.0010 | 0.0010 |
| OP MGR | 0.0073 | 0.0073 | 0.0073 | 0.0073 | 0.0073 | 0.0073 |
| | | | | | | |
| SUBT PROC | 0.0401 | 0.0401 | 0.0474 | 0.0474 | 0.0727 | 0.0727 |
| | | | | | | |
| COST/FT | 0.173 | 0.261 | 0.178 | 0.263 | 0.199 | 0.280 |

EXHIBIT 2 PAGE 7

# Exhibit A Estimated Standard Processing Costs 3-5/8 Inch

Page 3 of 4

|  | 362 TTS 137-18 | 362 TTS 137-30 | 362 TSO 125-18 | 362 TSO 125-30 | 362 TSE 125-18 | 362 TSE 125-30 |
|---|---|---|---|---|---|---|
| STEEL COST | 0.1598 | 0.2663 | 0.1581 | 0.2615 | 0.1537 | 0.2530 |
| PROCESSING COST |  |  |  |  |  |  |
| LABOR | 0.0035 | 0.0035 | 0.0104 | 0.0104 | 0.0358 | 0.0358 |
| SHOP RENT | 0.0050 | 0.0050 | 0.0050 | 0.0050 | 0.0050 | 0.0050 |
| ELECT | 0.0033 | 0.0033 | 0.0033 | 0.0033 | 0.0033 | 0.0033 |
| SUPPLIES | 0.0049 | 0.0049 | 0.0049 | 0.0049 | 0.0049 | 0.0049 |
| LUBRICANTS | 0.0008 | 0.0008 | 0.0008 | 0.0008 | 0.0008 | 0.0008 |
| FORKLIFT DEP | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 |
| FORKLIFT FUEL | 0.0002 | 0.0002 | 0.0002 | 0.0002 | 0.0002 | 0.0002 |
| BANDING | 0.0023 | 0.0023 | 0.0023 | 0.0023 | 0.0023 | 0.0023 |
| STRAPPER DEP | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 |
| TRUCK DEP | 0.0002 | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 |
| TRUCK FUEL | 0.0002 | 0.0002 | 0.0002 | 0.0002 | 0.0002 | 0.0002 |
| COMP DEP | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| PLANT WIRING | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |
| MFG MACH DEP | 0.0005 | 0.0005 | 0.0008 | 0.0008 | 0.0008 | 0.0008 |
| MACH R&M | 0.0030 | 0.0030 | 0.0030 | 0.0030 | 0.0030 | 0.0030 |
| SLITTING | 0.0073 | 0.0073 | 0.0073 | 0.0073 | 0.0073 | 0.0073 |
| SMALL TOOLS | 0.0004 | 0.0004 | 0.0004 | 0.0004 | 0.0004 | 0.0004 |
| TRASH | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 | 0.0001 |
| ACERO | 0.0010 | 0.0010 | 0.0010 | 0.0010 | 0.0010 | 0.0010 |
| OP MGR | 0.0073 | 0.0073 | 0.0073 | 0.0073 | 0.0073 | 0.0073 |
| SUBT PROC | 0.0401 | 0.0401 | 0.0474 | 0.0474 | 0.0727 | 0.0727 |
| COST/FT | 0.200 | 0.306 | 0.205 | 0.309 | 0.226 | 0.326 |



EXHIBIT 2 PAGE 8

**Exhibit A Estimated Standard Processing Costs 6 Inch** — Page 4 of 4

| | 600 TTS 137-30 | 600 ISO 125-30 | 600 TSE 125-30 |
|---|---|---|---|
| STEEL COST | 0.3618 | 0.3569 | 0.3485 |
| | | | |
| PROCESSING COST | | | |
| LABOR | 0.0035 | 0.0104 | 0.0358 |
| SHOP RENT | 0.0050 | 0.0050 | 0.0050 |
| ELECT | 0.0033 | 0.0033 | 0.0033 |
| SUPPLIES | 0.0049 | 0.0049 | 0.0049 |
| LUBICANTS | 0.0008 | 0.0008 | 0.0008 |
| FORKLIFT DEP | 0.0001 | 0.0001 | 0.0001 |
| FORKLIFT FUEL | 0.0002 | 0.0002 | 0.0002 |
| BANDING | 0.0023 | 0.0023 | 0.0023 |
| STRAPPER DEP | 0.0001 | 0.0001 | 0.0001 |
| TRUCK DEP | 0.0001 | 0.0001 | 0.0001 |
| TRUCK FUEL | 0.0002 | 0.0002 | 0.0002 |
| COMP DEP | 0.0000 | 0.0000 | 0.0000 |
| PLANT WIRING | 0.0000 | 0.0000 | 0.0000 |
| MFG MACH DEP | 0.0005 | 0.0008 | 0.0008 |
| MACH R&M | 0.0030 | 0.0030 | 0.0030 |
| SLITTING | 0.0073 | 0.0073 | 0.0073 |
| SMALL TOOLS | 0.0004 | 0.0004 | 0.0004 |
| TRASH | 0.0001 | 0.0001 | 0.0001 |
| ACEFO | 0.0010 | 0.0010 | 0.0010 |
| OP MGR | 0.0073 | 0.0073 | 0.0073 |
| | | | |
| SUBT PROC | 0.0401 | 0.0474 | 0.0727 |
| | | | |
| COST/FT | 0.402 | 0.404 | 0.421 |

EXHIBIT 2 PAGE 9

TRAKLOC PACIFIC
LIABILITIES
AS OF 10/26/07
ATTACHMENT TO P47 AGREEMENT

|  |  | AMOUNT |
|---|---|---|
| **PARTNERS PAY** |  |  |
| TODD BEASLEY | 42,307.76 |  |
| CURT KINNEY | 213,640.13 |  |
| T BEASLEY ACCRUED | 1,923.08 |  |
| C KINNEY ACCRUED | 3,365.38 |  |
| TOTAL PARTNER PAY |  | 261,236.35 |
| **PAYROLL** |  |  |
| D MORRELL ACCRUED | 8,616.00 |  |
| D MORRELL ACCRUED | 2,154.00 |  |
| SHOP WE 10/26/07 | 1,700.00 |  |
| WILLIAM ROGERS ACCRUED | 1,292.00 |  |
| TOTAL PAYROLL |  | 13,762.00 |
| **TRADE PAYABLE** |  |  |
| ADVANTA | 33,061.60 |  |
| ALLIED WASTE | 422.24 |  |
| AMERICAN FAST FREIGHT | 42,314.00 |  |
| AMS | 5,000.61 |  |
| ARCHITECTURAL METAL PRODUCTS | 74,708.42 |  |
| AT&T | 238.97 |  |
| BAY COUNTIES PETROLEUM | 83.32 |  |
| BB INDUSTRIAL | 74.92 |  |
| C R FIRELINE | 153.00 |  |
| CINTAS | 341.26 |  |
| COMCAST | 167.38 |  |
| C KINNEY EXPENSE REPORTS | 8,917.08 |  |
| D MORRELL EXPENSE REPORT | 4,577.74 |  |
| EDWARD CALLAN | 3,600.90 |  |
| FASTENAL | 399.08 |  |
| GRAINGER | 738.73 |  |
| HALL EQUITIES | 62,621.10 |  |
| HILLCREST VIEW | 1,405.00 |  |
| Holmes Drywall | 1,000.00 |  |
| HOMPESCH & EVANS | 4,958.19 |  |
| HUGHES & ASSOCIATES | 2,480.53 |  |
| INDUSTRIAL SERVICES COMPANY | 28,141.52 |  |
| KAMPS PROPANE | 93.91 |  |
| KOMATSU | 176.71 |  |
| KONECRANES | 1,812.60 |  |
| KUSTUM STEEL FABRICATORS | 1,644.50 |  |
| MANCE MANUFACTURING | 5,585.00 |  |
| MARSH USA | 4,817.00 |  |
| MINOL | 51.76 |  |
| OLES MORRISON RINKER | 8,467.77 |  |
| OXBOW CARBON & MINERALS | 218,968.47 |  |
| PACIFIC GAS & ELECTRIC | 34.21 |  |
| PHILLIPS HASKENS & INGWALSON | 40,256.06 |  |
| PITTSBUGH PROCESSING | 8,541.11 |  |
| RAM MOTOR FREIGHT | 10,558.82 |  |
| SAMCO | 14,066.16 |  |
| SAMMONS TRUCKING | 16,044.04 |  |
| SIGNODE | 6,561.67 |  |
| STATE OF ALASKA | 100.00 |  |
| STATE OF CALIFORNIA | 800.00 |  |
| TB EXP (EST) | 10,000.00 |  |
| TRAKLOC MIDWEST | 31,949.64 |  |



EXHIBIT 2 PAGE 10

TRAK DC PACIFIC
LIABILITIES
AS OF 10/26/07
ATTACHMENT TO P47 AGREEMENT

|  |  | AMOUNT |
|---|---|---|
| UPS | 2,036.54 | |
| VERIZON | 244.38 | |
| VIDEO JET | 932.95 | |
| WALSH KELLIHER & SHARP | 21,434.73 | |
| WILLIAM SCOTSMAN | 2,343.15 | |
| TOTAL TRADE PAYABLES | | 682,926.75 |
| | | |
| **ACCRUED INTEREST AS OF JUNE 30 2007** | | |
| T BEASLEY | 73,066.51 | |
| ARCHITECTURAL METAL-EQUILEASE | 23,332.13 | |
| ARCHITECTURAL METAL - ALL POINTS | 19,461.97 | |
| TOTAL INTEREST | | 115,860.61 |
| | | |
| **ACCRUED ROYALTIES THRU 9/30/08** | 398,867.00 | |
| TOTAL ACCRUED ROYALTIES | | 398,867.00 |
| | | |
| **CUSTOMER PREPAYMENT** | | |
| CALPLY | 95,610.72 | |
| TOTAL PREPAYMENTS | | 95,610.72 |
| | | |
| **LONG TERM LIABILITIES** | | |
| ARCHITECTURAL METAL - EQUILEASE | 565,905.81 | |
| ARCHITECTURAL METAL - ALL POINTS | 561,392.64 | |
| DE LAGE FORKLIFT | 25,432.92 | |
| FORD ESCAPE | 19,319.50 | |
| FORD F 150 | 17,374.70 | |
| GREAT AMERICAN PHONE | 3,522.81 | |
| TODD BEASLEY | 820,606.26 | |
| GTS | 27,183.40 | |
| M BERSTEIN | 100,000.00 | |
| NORTHRIM FUNDING | 175,018.56 | |
| TOTAL LONG TERM LIABILITIES | | 2,315,756.60 |

TOTAL LIABILITIES                3,884,020.03

NOTES TO LIABILITY SCHEDULE

1 INTEREST FOR LONG TERM LIABILITIES NOT ADJUSTED SINCE JUNE 30, 2007

2 TRADE PAYABLES ONLY INCLUDE AMOUNTS FOR VENDOR INVOICES RECEIVED AS OF OCTOBER 26, 2007.

3 TRADE PAYABLES DO NOT INCLUDE LATES FEES ATTEMPTED TO BE ASSESSED BY VENDORS.

4 ONGOING LEASE/RENT OBLIGATIONS ARE SHOWN ONLY AS TO CURRENT AMOUNTS DUE.

5 ONGOING INSURANCE OBLIGATIONS ARE SHOWN ONLY AS CURRENT AMOUNT DUE.

6 LIABILITY AMOUNTS FOR C KINNEY EMPLOYMENT CONTRACT ONLY SHOWN FOR AMOUNTS CURRENTLY DUE.





EXHIBIT 2 PAGE 11